City of Waco v. M. V. B. Powell and others.

1—The Legislature has power to enact a general law, applicable to towns or cities having a designated population, empowering their corporate authorities to make town ordinances not inconsistent with the constitution.

2—The control over streets and public places, and to abate nuisances, conferred on aldermen of towns and cities by the seventeenth section of the act of January 27th, 1858, (Paschal's Dig., Art. 5263,) is not repugnant to the constitution.

3—See the opinion for a town ordinance, impounding hogs going at large in the streets, which is *held* to be within the powers conferred upon aldermen by the act of 1858, above referred to.

Appeal from McLennan. Tried below before the Hon. A. J. Evans.

The appellees, Powell and sundry others, sued out an injunction against the mayor and other corporate authorities of the city of Waco, to restrain them from enforcing the town ordinance known as the "hog law," against the hogs of the plaintiffs, allowed to go at large in the streets, and some of which had been seized by the city marshal in conformity with the directions of the ordinance.

The case came to trial at the Spring term (1869) of the McLennan District Court, when a jury was waived and the case submitted to the judge on an agreed statement of the facts.

The opinion of this court contains all the facts necessary to be stated.

The court below perpetuated the injunction, and the city authorities appealed.

*J. T. Flint* and *Richard Coke*, for the appellants. It will be seen by reference to the statement of facts, that the corporation of the city of Waco was organized under and by virtue of the Acts of January and February, A. D. 1858, Paschal's Digest, pp. 887, 890, "To provide for the incorporation of towns and cities." These acts are the charter which

prescribe, define and limit the authority of municipal corporations organized under them.   Articles 5262 and 5263, Paschal's Digest, contain the grant of authority, by virtue of which the ordinance in question was enacted.

The first of those articles (5262) gives power " to enact such by-laws and ordinances not inconsistent with the constitution and laws of the State, as shall be deemed proper for the government of the town."   The other article (5263) grants power over the streets and other public places in the town—to prevent and abate nuisances; to establish and regulate markets, and to " do whatever else may be necessary, to give effect to the provisions of this act."

In the numerous cases we have examined, in which the powers of municipal corporations are discussed, we have not found one in which the power granted in the charter of the corporation is broader or more comprehensive than that granted in the two sections of the act above quoted.   It would seem difficult to employ language to enlarge the signification of those two sections.   The only limitation upon the power granted to enact such by-laws and ordinances as are " deemed proper for the government of the town," and to " do whatever else may be necessary to give effect to the provisions of this act," is that the said by-laws and ordinances shall not be inconsistent with the constitution and laws of the State.   Subject to this limitation the legislative power granted by this act (January, 1858) to the municipal corporation is supreme over the locality and objects embraced in its terms.   The authority of the Legislature under the constitution to delegate this power to enact municipal laws, is too well established to be now discussed. (Hope v. Deaderick, 8 Humph., 1.)   Such corporations, with powers of legislation adequate to the proper government, sanitary and police regulations of the municipalities in which they exist, are coeval with the earliest settlement of the several States of the Union, and as the acts of the Legislatures, and the books of reports of the several States will show, have, from the first, constituted no inconsiderable, or unimportant, part of the

machinery of government of the country. The municipal or city government is an *imperium in imperio.* The board of aldermen is a miniature legislature. Its enactments, not inconsistent with the constitution or the laws of the State, in furtherance of objects necessary to the proper government of the town, are laws to the town of as high obligation and as supreme power as are the enactments of the Legislature of the State to the people of the State.

In Brown v. The Mayor, &c., New York, 3 Barbour's R., 258, the court hold this language : "Wherever it may rightfully declare a duty, prohibit an act or enforce an obligation, in a governmental capacity, then the municipal corporation in respect to the thing done acts instead of the State, and in a sovereign character, and so may be held irresponsible.

\*          \*          \*          \*          \*          \*          \*          \*

"It ordains law and exacts obedience. As a lawgiver a municipal corporation is irresponsible, and the court cannot interfere with its police regulations which are ordained as laws for the observance of the citizen."

And in Milhau v. Sharp, 17 Barbour's R. P., 438. The Supreme Court of New York again say : "The corporation yet has the exclusive right to control and regulate the use of the streets in the city. In this respect it is endowed with legislative sovereignty. The exercise of that sovereignty has no limit, so long as it is within the objects and trusts for which the power is conferred. An ordinance regulating a street is a legislative act, entirely beyond the control of the judicial power of the State."

Again, in the case of Milhau v. Sharp, which was twice before the Supreme Court of New York, 15 Barbour's Rep., p. 240, that court say : "If, however, the Legislature of the State have the constitutional power upon the subject, and the mayor, aldermen and commonalty have the charter power to pass the law or ordinance, the entire discretion as to the details of the law or ordinance, is vested in the Legislature, or in the common council, and no judge or judicial tribunal has a right to

interfere, because they may be of opinion that such discretion was unsound, indiscreet, erroneous, or even corrupt."

In Van Wormer v. The Mayor, etc. of the city of Albany, 15 Wend. R. P., 264, a case where the corporate authorities of the city of Albany declared the appellant's house and grounds a nuisance, and had the house torn down, and were proceeding to have the grounds dug down, the appellant offered testimony to prove that his house and grounds were not a nuisance, which was ruled out, on the trial below, it was held by the Supreme Court on appeal that " the evidence offered to show that there was in fact no nuisance, was properly rejected. That point had been adjudicated by the proper tribunal, and was not in issue at the circuit."

The principles decided in these cases are as applicable in Texas as in New York, as will be seen by an examination and comparison of the constitutions of the two States, and of the charter powers of the cities of New York and Albany, with those granted by the act of the Texas Legislature of January, 1858, before referred to, to municipal corporations organized under it. (City of Austin v. Peck, 22 Tex. R., 261.)

From these authorities we deduce the following conclusions:

1. That the ordinances enacted by the corporate authorities of the city of Waco, in accordance with and not in excess of its charter power, are supreme law to the citizen.

2. That the judges or courts of the country can no more interfere with the operation of such corporation laws, or inquire into their policy or expediency, than if they had been enacted by the Legislature of the State.

The question now arises, whether the corporate authorities of the city of Waco, in adopting the ordinance complained of in this suit, exceeded their charter power, or in other words whether said ordinance is "inconsistent with the constitution or laws of the State."

If it is, of course, to the extent that it is thus inconsistent, the ordinance is void. But we respectfully submit that no such inconsistency exists, that the ordinance as a whole and in

all its details, is sustained by the analogies of various State laws, the constitutionality of which have never been doubted.

The control over the streets and other public places, given to the board of aldermen by the law of 1858, (Art. 5263, Pasch. Dig.) and the command in the same section that they shall prevent nuisances, and remove such as exist within the limits of the corporation, at the expense of those by whom they were occasioned, most clearly confides to the discretion of the board the determination of what constitutes a nuisance. To hold otherwise would be destructive of the end sought to be accomplished by the Legislature. As was said by the court in Van Wormer v. The Mayor, etc., of the city of Albany, (15 Wend., 264): "It is right that such power should exist somewhere, to be exercised upon proper emergency. If the city authorities were obliged to await the slow process of a public prosecution, the evil arising from nuisances would seldom be avoided."

The power to prevent and abate nuisances, can not, in the nature of things, be executed unless accompanied by the right to decide what is a nuisance, and the latter power is inseparable from the former, on the familiar maxim, "Whoever grants a thing is supposed also to grant, tacitly, that without which the grant itself would be of no effect." (Brooms, Leg. Max., 310.)

In virtue of charter powers, more restricted than those under which the appellants justify, municipal corporations in Tennessee and Kentucky were fully sustained in the enforcement of by-laws, one declaring the "showing or exhibiting stud horses in a town a nuisance," and the other, the "running at large of hogs in the streets of the town a nuisance." (Nolin v. Mayor, etc., of Franklin, 4 Yerger, p. 163; McKee v. McKee, 8 B. Monroe, [Law and Equity] p. 433.) Upon the same principles, the control over the streets and other public places of the town given by the statute, would have authorized the enactment of the ordinance in question. The right of individuals to convert the public streets into a hog, cow or horse ranche, by allowing or compelling their stock to run there,

can not exist compatibly with the right of the board of aldermen to control the same streets. The two rights are inconsistent, and can not exist together.

This Art. 5263, being a general law of the State, and in virtue of the power conferred by it upon the corporate authorities of the city of Waco, to declare that hogs running at large in the streets of the city are a nuisance, the ordinance adopted by the latter in the exercise of that power, becomes paramount to any other general law of the State which recognizes that such animals may run at large, to the extent of the limits of the corporation. In the enactment of this ordinance the board of aldermen wielded the sovereignty of the State. (See New York cases above cited.) A special statute controls a general statute on the same subject.

The ordinance in question directs the seizure of all hogs found running at large in the public streets, etc., of the town, that notices descriptive of the marks, class, etc., of the animals shall be posted, and giving notice that the same will be sold five days after the date of the notice, if not reclaimed and expenses paid by the owner, etc., etc., etc. It is objected that the title of the owner to property sold under this ordinance is attempted to be divested, not by due course of law, because the citizen is entitled to a trial by jury on all issues affecting his right to his property, but by a species of confiscation, and for this reason, it is contended that the ordinance is repugnant to the constitution. This argument, so far from being sound has not even the merit of being plausible. When, under the provisions of the ordinance, the city marshal seizes a hog, he is required to give notice by publication, etc., etc., etc. The proceedings under this ordinance are strictly *in rem.*, no personal liability is denounced against the owner. The property alone is dealt with. In actions *in rem.* constructive service by publication has always been held sufficient to give validity to judgments rendered in them. No one doubts the constitutionality of our statutes providing for service by publication on unknown heirs; or of the statute providing for service by

publication on a non-resident defendant, or on a person absent from the State, or on a transient person, or upon one whose residence is unknown; or of our estray laws, under which the title of the owner in the estray is divested on constructive service by publication.

The owner of the animal thus seized by the city marshal, is notified by published notice of the proceedings pending against his property; he has the right to have the matter investigated in the courts of the country, if he chooses to do so. In an action for that purpose, it is incumbent on the individual or officer who executes this ordinance, to verify every fact necessary to justify him in seizing the animal. That is, that the hog was running at large in the streets of the town, in violation of the provisions of the ordinance. The officer acts at his peril, subject to damages, if the facts do not show a violation of the ordinance. If the owner chooses not, by proper action, to contest the matter before the courts, it is the result of his voluntary election, and he can not complain. He has notice, the courts were open to him, so much of the value of his property only is taken as will defray the expense of removing the nuisance which is created; the balance is returned to him. He is deprived of no remedy. All the constitutional guarantees for the protection of his property are open to and tendered him.

He is dealt with in a way least hurtful to him, consistent with the public convenience and safety. The proceeding is summary, it is true, but the exigencies of the public require that it shall be so. As was said by the Supreme Court of Kentucky, in Jarman v. Patterson, 7 Monroe, 647, a case precisely in point with this:

"It is a maxim inseparable to the well being of society, to 'use your own so as not to injure the rights of others.' This maxim will often be violated by the lawless, and to preserve and enforce it, even in favor of individual rights, belongs to the Legislature.

"It is on this principle that the erection of any branch of busi-

ness, or unclean or unhealthy substance placed by A on his own land, injurious to the health and comfort of his contiguous neighbors, may be demolished or removed as a nuisance, and A be made liable in damages for the injury.

"It is also on this principle that by the common law, one citizen may restrain the cattle of another damage feasant, on the soil of the former. It is on the same ground that the Legislature has allowed one citizen who has a lawful fence to kill the cattle and horses of another after so many repeated breaches.

"It is by the same rule that the custody of gunpowder, in a place where its explosion may destroy the estates of others, in cities or elsewhere, may be restrained by proper regulations."

Again, in the same able and well considered opinion, the court say:

"It is true, that one of the objects avowed by the constitution for its own adoption is the security of the enjoyment of life, liberty and property. It is true, that the citizen can not be deprived of his life, liberty or property, unless by the judgment of his peers, and the law of the land; but it is equally true that considerable latitude is left to the discretion of the Legislature in controlling property for public purposes, and to *avoid public injuries*. We say *public* purposes and *public* injuries, for we do not contend for a power in the Legislature to appropriate private property to private purposes, or recognize a right to transfer the estate of A to the use of B, without the consent of the owner. Such an interference with the rights of property is not now to be considered. It is true that compensation to an individual is secured by the constitution, before his estate can be applied to public uses; but still there is a considerable scope of power, uncontrolled by this provision, within which the Legislature may regulate the tenure and control the use of property, and such a power is necessary in all well regulated governments."

The facts of the case in which the above opinion was delivered, are substantially these:    By an act of the Legislature of

Kentucky, it was provided 'that if any slave shall be found going at large, working for himself, etc., for more than one day at a time, in Harrodsburg or Richmond, "it shall be lawful for the trustees of such towns to cause said slave to be hired out to the highest bidder, for the term of ten days, or to commit such slave to jail for ten days, and until his or her prison fees are paid by his or her owner. The money to be paid for such hiring to go in aid of the funds of the town." Jarman's slave was arrested and put in jail for violation of this law, and was dealt with in accordance with its provisions, when Jarvin sued out his writ of replevin for the slave against Patterson, the jailor. The constitutionality of the law was assailed in the pleading and argument. The law is sustained in the opinion of the court as constitutional and valid. It will be observed that the slave, in this case, is treated not as a person, but simply as property, and that the law under which he was arrested contains no provision for service of notice upon the owner. The opinion goes the length of deciding that notice was not necessary. Nor does the owner receive the proceeds of the hiring of the slave. They "go in aid of the funds of the town." Every point that has been made against the ordinance we are considering, was made with much more force and reason than against the law in this case. If that was valid and constitutional, *a fortiori*, must our ordinance also be so.

It is respectfully submitted that the authorities we have cited abundantly show said ordinance to be within the legal competence and power of the corporate authorities of the city of Waco to pass and ordain, and, of a consequence, that the same is entitled to the obedience of the citizen.

It was insisted in argument below that, after the ordinance was suspended, it could only become of force again by re-enactment in full. That the resolution of the board reviving the law, and the published notice of it, does not have that effect. The effect of this argument is that a suspension of the ordinance is a repeal of it. This proposition can not be maintained. Nothing is more common in legislative proceedings

than the suspension of statutes and their sebsequent revival. "The suspension of the statute is not the repeal of such statute." (Brown v. Barry, 3 Dall., 365.)

Even when a statute expires by its own limitation, and is revived by another statute, the law derives its force from the first statute. (Bacon's Abridg., v. 9, pp. 224, 225.)

When an act is revived, it is revived in that form and with that effect which it had at the moment it expired. (7 Cranch, p. 380.) These are well recognized common law principles.

In every case of corporations created by statute, so far as the statute directs and provides, it must rule; but in cases pretermitted by the statute, the principles of common law must govern. (Wier v. Bush, 4 Littell, 430.)

In the suspension and revival by the board of aldermen of the ordinance in question, it is submitted that the usual and customary legislative mode was pursued, a mode sanctioned as we have seen by the principles of the common law, which must govern when the statute, as in this case, is silent.

Nothing is more common than the suspension of city ordinances, where the public health or safety requires it, and their subsequent revival, when the temporary cause has passed away. We have never before heard the right of a municipal corporation doubted to do this. It belongs as a necessary incident to their right to legislate, and will always accompany that right in the absence of an express negation of it in the statute of its creation. It is due to his honor, the District Judge, to say that this point against the ordinance was considered in the court below as having no force.

On the trial below a jury was waived, and the case submitted to the court on the bill, answer and an agreed statement of facts. The judgment rendered was upon the whole case thus presented. It is respectfully submitted that said judgment should be reversed and the cause dismissed.

MORRILL, C. J.—That every man has a right to his own property, and to use it in such a manner and for such purposes

as to him may seem best calculated to promote his interest, pleasures or fancies, in a republican government, may be considered as a maxim of political economy as well as of law.

But as this holds true when applied to one man, it is no less true in its application to all men. Hence, a person living at such a distance from others as to have no intercourse or interference with their persons or property, could use his property without restriction. But if his residence or business pursuits are in such proximity to the dwelling places or occupations of others that an unlimited use or enjoyment of his property or pursuits abridges the rights and privileges of person or property of his neighbors, then the same political economy, justice and law requires "*sic utere tuo, ut alienum non laedar.*" While society furnishes its advantages and pleasures, it also abridges some of the privileges of a country life. A man living in the country, and at a remote distance from others, can have such animals in his possession, and use them in such a way and manner as may gratify his own fancies, and whether his fancies coincide with those of others or not concerns himself alone; while, on the contrary, a man living in a village or city has no right to have such animals about him, or pursue such occupations, as are calculated to impair the health, offend the natural senses, or destroy the property of others.

On the 27th of January, 1858, the Legislature passed an act to provide for the incorporation of towns and cities. (Pásch. Dig., Arts. 5247, 5281.) Article 5263 provides, "the board of aldermen shall have and exercise control over the streets and other public places in the town. They shall, as far as practicable, prevent any nuisances within the limits of the corporation, and cause such as exist to be removed, at the expense of the persons by whom they were occasioned," etc.

The citizens of Waco became incorporated under and by virtue of the provisions of this act, and elected their city officers.

In March, 1866, the board of aldermen of the city of Waco adopted the following ordinance:

"AN ORDINANCE to provide for removing the nuisance of hogs from our streets, alleys and other public places in the city of Waco.

"*Be it ordained by the Mayor and Council of the city of Waco*, That hogs going at large upon the streets, alleys and other public places in this city, constitute a public nuisance, which it is by law made the duty of this Council 'to cause to be removed at the expense of the persons by whom it is occasioned,' therefore, be it further ordained :

"SECTION 1. It shall be the duty of the marshal of the city to cause to be taken up any and all hogs that may be found going at large upon any street, alley, or other public place in the city of Waco, after ten days from the publication of this ordinance, and cause the same to be placed and kept in a secure inclosure, to be provided for that purpose, until the same are disposed of in the manner hereinafter provided. He shall, immediately after taking up such hogs, post up written notices at three or more public places in the city (one at the court house), describing therein the marks and class of all such hogs, and giving notice that the same will be sold five days after the date of such notice, unless the owners shall come forward and reclaim the same, as hereinafter provided.

"SEC. 2. At any time before the sale of any such hogs, under this ordinance, the owner thereof may reclaim the same, by making affidavit or giving other satisfactory evidence of his ownership, and paying the fees of the marshal for taking up, etc.

"SEC. 3. If no owner shall demand any hog taken up under this ordinance by the day of sale, as advertised under § 1 hereof, the marshal shall proceed to sell the same at public outcry, to the highest bidder for cash, in United States treasury notes, and shall forthwith pay the amount of sales to the city treasurer, retaining in his hands the amount of fees allowed him under this ordinance. The marshal shall keep a correct description of the marks and class of every hog so sold by him, and the price sold for, in a book to be by him kept for that purpose, where it may, at all times, be examined by any citizen.

"SEC. 4. The owner of any hog that may be sold under this ordinance, may at any time within thirty days after such sale, appear before the mayor and identify and prove his ownership of such hog; and thereupon the mayor shall give such owners a draft upon the city treasurer for the amount for which such hog was sold, less all costs accruing upon such taking up, selling, etc.

"SEC. 5. For each hog taken up and advertised by him under this ordinance, and which is not sold, the city marshal shall receive one dollar, to be paid by the owner who proves him away; and for each hog so taken up, advertised and sold, he shall receive one dollar and fifty cents, to be paid out of the amount of the sale of such hog."

Which ordinance was published immediately after its passage, in a semi-weekly newspaper in the town of Waco, for more than ten days.

On the 9th day of July, 1866, the execution of said ordinance was, by resolution of the board of aldermen of the city of Waco, suspended.

On the 6th day of May, 1868, the board of aldermen adopted a resolution rescinding said order or resolution of suspension, and notice of said recision was duly published in a semi-weekly newspaper published in the city of Waco, for more than ten days immediately after said 6th day of May, and more than ten days preceding the acts complained of in this suit. About the 25th of May, 1868, the town marshal did find hogs belonging to some of the appellees running at large in the public streets of Waco, in violation of provisions of the ordinance, and did seize them, and was proceeding to deal with them in accordance with the provisions of the ordinance, when this suit was filed and injunction granted.

In their petition appellees attack the legality and validity of the ordinance, allege that their hogs are being seized by the city marshal, and pray injunctions, etc., restraining further execution of the ordinance, which was granted.

Appellants appeared, and moved to dissolve the injunction;

motion overruled.    Answered: alleging incorporation of the
city of Waco, setting up the ordinance aforesaid, passed by the
board of aldermen of said city; alleging that the hogs were
seized in the streets of Waco by virtue of its provisions, etc.,
and justified under said ordinance.

Jury waived.    Case submitted to the court on an agreed
statement of facts.

Judgment for appellees, declaring the ordinance invalid,
perpetuating the injunction, and for cost against appellants.
All the rulings of the court excepted to, and notice of appeal
to the Supreme Court given.    Statement of facts agreed on
and certified to.    Appeal bond within the terms and time
prescribed by law filed and approved.

The city of Waco was originally chartered by the Legisla-
ture of Texas, but reorganized under the act of the Legislature
of January 27th, 1858.

The pleading, statement of facts and bill of exceptions, in
connection with the judgment rendered, it is believed present
for adjudication in this court but one question, and that is
whether the power resides in the corporate authorities of the
city of Waco to enact and enforce the ordinance complained
of in this case.

The streets of a city do not belong to any one man of the
city, but to the public at large; and every person has a right
to use the public streets of a city in conveying his person or
property from one place to another.    This is the only right he
has in the streets.    He has no right to use the land set apart
for streets for a habitation, for a pasture, or for anything else,
except to travel on and over, than he has to use any other per-
son's land for that purpose, and for the like reason : *because it
is not his property.*

The streets being the property of the public, whoever repre-
sents the public not only has a right, but it is their duty, to see
that these streets shall subserve the interests of those who wish
to use them for their designed purposes.

The Legislature represents the sovereign power; and, as

such, is competent to declare that it shall not be lawful for any person to appropriate the property of another, or of the public, to his own use. The Legislature can make a general law, applicable to every part of the State, and it can make a general law applicable to cities and towns having a designated population, authorizing the towns and cities to legislate in any particular manner, not inconsistent with the constitution.

We see nothing in the act of the Legislature conferring power on villages and communities to become incorporate cities and towns, or in the ordinance of the city of Waco, herein stated, assailable for being unconstitutional.

The mayor and aldermen, as the protectors of the public health, public convenience, and public good generally, have power to declare that the public property of the city of Waco shall not be used for the benefit of individuals, even if it should not be detrimental to citizens of the city; and more especially when otherwise the streets would be made unfit for their destined use, the travelers incommoded, and the citizens generally or specially in any manner troubled.

Should the citizens of the city of Waco be aggrieved, by the action of the mayor and council of the city, their remedy lies at the ballot box. Neither the citizens of Waco, or the courts of the State, have the right or power to review or revise the ordinances passed by the legally constituted authorities, except as to their constitutionality.

In reversing the judgment of the District Court we are sustained by the following authorities, cited by the counsel in their very able brief: Hope v. Deaderick, 8 Humph., 1; Brown v. Mayor, 3 Barbour, 258; Milhau v. Sharp, 17 Barbour, 438; Milhau v. Sharp, 15 Barbour, 240; VanWormer v. Mayor, 15 Wendell, 264; Nolin v. Mayor, 4 Yerger, 163; McKee v. McKee, 8 B. Monroe, 433; Jarmon v. Patterson, 7 Monroe, 647.

Our remarks may be liable to criticism from their prolixity upon plain principles of an elementary character; but as the allegations in the petition that the animals interdicted against running at large in the streets are styled street scavengers, and

are really beneficial to the city, places the plaintiffs in no other than a hostile attitude to the city authorities, and in a defiant position to the ordinances of the city, and as assuming to act as the owners of the public streets and guardians of the public health, we have endeavored to correct this position.

The remedial part of the ordinance, as well as the ordinance entire, partakes of the character and nature of an estray law, as applicable to the city, for the animals therein mentioned, in addition to declaring the animals a nuisance.

The ordinance adopted by the mayor and council was based upon the authority conferred, hereinbefore specified, giving this body " power to have and exercise control over the streets," and " to cause nuisances to be removed at the expense of the persons by whom they were occasioned."

Judgment reversed, and cause dismissed and injunction dissolved.

Ordered accordingly.