### HARPER v. CITY OF WICHITA FALLS et al.

### No. 13673.

Court of Civil Appeals of Texas. Fort Worth.

April 23, 1937.

Rehearing Denied May 14, 1937.

744

B. D. Sartin and H. L. Ratliff, both of Wichita Falls, for appellant.

T. A. Hicks and Thelbert Martin, both of Wichita Falls, for appellee City of Wichita Falls.

J. T. Montgomery, of Wichita Falls, and Sewall Myer, of Houston, for appellee Parkrite Corporation.

R. R. Lewis and George D. Neal, both of Houston, and H. P. Kucera, A. J. Thuss, and J. Manuel Hoppenstein, all of Dallas, amici curiæ.

DUNKLIN, Chief Justice.

The above entitled cause was instituted by W. R. Harper against the City of Wichita Falls to enjoin the enforcement of certain parking meter ordinances passed by the city, attached as exhibits to the petition and hereinafter copied. The Parkrite Corporation also was made a defendant, and plaintiff prayed for a mandatory writ requiring it to remove the parking meters it had installed pursuant to authority from the city under its contract to purchase them from the Parkrite Corporation. Plaintiff's application for the issuance of a temporary writ of injunction, restraining enforcement of the ordinance during pendency of the suit for trial on its merits, was refused by the trial court, and this appeal is from that order.

Following are the ordinances in question:
"Ordinance No. 1243.

"An ordinance, creating and defining meter zones in the City of Wichita Falls, Texas; providing for the installation, operation and maintenance of mechanical devices to regulate parking in said parking meter zones; providing for the collection of regulatory and inspection fees for the use of such devices; providing for the deposit of such fees by the city treasurer in a special fund; providing for the method and purposes of disbursement of said fund; making it unlawful to use the streets or portions of the streets so designated for parking except through use of parking meters; defining what act shall be unlawful, and fixing penalties for the violation of the provisions of this ordinance, and repealing all ordinances and parts of ordinances in conflict herewith and declaring an emergency.

"Whereas, because of the width of certain streets in certain sections of the City of Wichita Falls the free moving of traffic in the down-town business area is congested and impeded; and

"Whereas, previous attempts to regulate the parking of vehicles in the aforesaid area have not been as successful as is desirable for the safety and welfare of the public, and because of the small number of traffic policemen available therefor, and because of the size of the aforesaid area; and,

"Whereas, because numerous operators of motor vehicles, taking advantage of the above named situation by parking for unreasonable long periods of time in close proximity to other motor vehicles so parked on the most congested parts of the City's business streets, tends to further impede traffic and in addition thereto is unfair to business interests in such area and to motorists, and constitutes a danger to the life, limb and property of motorists and pedestrians; and,

"Whereas, such traffic conditions require limited parking in certain areas of the City of Wichita Falls, and enforcement of such limitation through the present means and methods, is expensive, inadequate and unsatisfactory; and,

"Whereas, it is advisable to employ some mechanical assistance in the enforcement of said parking limitations, and in the opin-

·ion of the City Council, the most satisfactory way by which the above conditions may be remedied is by the designation of individual parking spaces in said area, and by providing for the use of mechanical parking time indicators or meters in conjunction therewith, by restricting parking in said area to reasonable intervals of time, and by compelling the operators of vehicles who enjoy the use of the parking spaces so designated to pay a portion of the cost of the establishment and maintenance of the same, and for the purpose of regulating and controlling the same."

Following those recitals are provisions setting apart as a parking meter zone both sides of several streets in the city, including Scott avenue, and providing for a designation of spaces for parking of vehicles and for the installation and operation of parking meters, such spaces to be indicated by painted lines upon the surface of the street within the parking meter zone; the parking meters to be placed upon the curb adjacent to and alongside of the individual marked spaces to be identified, and with signal devices indicating whether or not the parking space is then in use. There were further provisions that a charge of 5 cents would be made for the use of a parking space, to be paid by a deposit of a 5-cent coin in the meter which would cover the right to use the parking space for a period of one hour. The hours within which the fee would be required would be between 8:30 a. m. and 6:30 p. m. on any day except Sundays and holidays, when officially designated by the board of aldermen as such. It was made an offense punishable by fine not less than $5 nor more than $100 for the occupancy of any parking space so designated beyond the limit of time so fixed, but that the same would not apply to a temporary stopping of such vehicle for the purpose of and while actually engaged in loading or unloading passengers or merchandise, or involuntary stopping of a vehicle out of control of the occupant; nor to vehicles of police or fire department of the city.

By Ordinance 1244 the fine for violating the provisions of Ordinance 1243 was changed to not less than $1 nor more than $100; and by ordinance 1249 the time limit for occupancy of parking meter space was changed from one hour to two hours.

It was further provided in the ordinance that the parking meters should be paid for exclusively from the receipts of the meters and the City of Wichita Falls would in no way be obligated to pay the same out of any other funds, moneys, or revenues, of the city, and that said funds should never be considered in determining the constitutional statutory and other legal limitations imposed by the city with respect to its power to create debts.

By section 24 of the ordinance the city clerk should collect from the parking meters the funds therein contained and deposit the same to the credit of the city in the city depository in a special fund called "Parking Meter Fund," and that same "shall be expended by the Board of Aldermen of the City of Wichita Falls, Texas, for traffic regulations and control and in promoting the safety and well being of the public in the handling of traffic upon the streets of the City of Wichita Falls, Texas. The five cent coin required to be deposited in said parking meter provided for herein is a police regulation and inspection fee to cover the cost of inspecting and regulating traffic involved in the proper handling of the traffic upon the streets of the City of Wichita Falls, Texas, and in the inspection, installation, operation, control, and use of parking meters and parking spaces described herein and involved in the checking up and regulating of the handling of traffic and of the parking of vehicles in the parking meter zones hereby created."

The city's contract with the Parkrite Corporation stipulated for purchase by the city from that corporation of 500 complete parking meters for the price of "$58.00 net per meter, completely installed and placed in operation on the streets or sidewalks of the City of Wichita Falls, Texas."

The city agreed to pass ordinances establishing zones for installation of the meters in its business district and for regulation and control of their use, requiring deposit of a 5-cent fee, and fixing and defining parking spaces, and limiting time of parking. The meters were to be operated by the city. Seventy-five per cent. of the fees collected would be turned over to the Parkrite Corporation to be applied on the purchase price of the meters; the remaining 25 per cent. to be kept by the city to pay for expenses of collection and regulation and control of traffic. After payment of the full purchase price, the meters belong to the city. The Parkrite Corporation expressly agreed to look solely to the fees so collected through the meters for their purchase price and would make no

claim for such payment out of any other resources of the city. It agreed further to execute a bond to protect the city from any damages growing out of the installation of the meters.

It was alleged in plaintiff's petition that he was engaged in the jewelry business, occupying a leased store fronting on Scott avenue, one of the public streets of the city and included in the district set apart by the city for the maintenance of the parking meters. He has followed the same business in that location for several years. Along Scott avenue parking meters have been erected, one of which is immediately in front of plaintiff's store.

Plaintiff further alleged that the ordinance was a zoning ordinance within the meaning of article 1011d, Vernon's Annotated Civil Statutes, and was void for failure of the city to publish prior notice of its passage, as required by the provisions of that statute.

It was further averred that for years prior to the passage of the ordinance parking on the public streets had been regulated by the usual designation of marks and signs, indicating parking spaces and limitations of two hours for which they could be occupied, all without the use of parking meters and without charge for such occupancy; that there is no proper relation between the erection and operation of the parking meters and the authority vested in the city by its charter and statutes for the control of its public streets; that the charges made for meter services were in excess of the amount which would be reasonable for the actual maintenance of the same; that plaintiff had lost profits in his business in the sum of $700 as the result of the maintenance of the meters and the charge for the use of same, which is properly chargeable as depreciation in the market value of his leasehold interest in his place of business.

As recited in appellant's brief, further grounds upon which the ordinances are challenged as being void and unenforceable are as follows: They are unreasonable and arbitrary; they unlawfully interfere with the rights of ingress and egress of private property, thereby contravening the due process clauses of the Federal and State Constitutions; they unreasonably interfere with the inherent right of a private citizen of the free use of the city streets; they constitute a revenue raising scheme not enacted for

traffic regulation and bear no true relation to regulation of traffic, but were passed for the sole purpose of shifting the burden of taxes from homesteads in the city to the users of the public streets; they amount to an indirect and insiduous tax, unwarranted and unauthorized by the charter of the city or the laws of the state; they were enacted under a private contract with the Parkrite Corporation under which the city is compelled to prosecute violations of law in order to get the funds with which to pay for the price of the parking devices and therefore are against public policy.

The application for a temporary writ of injunction was included in plaintiff's first amended original petition and attached to the petition was his verification, under oath, of the statements therein shown.

The City of Wichita Falls filed an answer embodying a general demurrer to the sufficiency of the petition for the relief prayed for; also certain special exceptions which need not be noted; further alleging that the meters do not interfere with the traffic on the streets; that the ordinance is a reasonable regulation of the flow of traffic on the streets of the city; that it in no wise interferes with the enjoyment of plaintiff's property or his property rights, and in no wise violates the due process of the Federal and State Constitutions; that the meters do have a proper relation to the regulation of parking and to the regulation of traffic on the streets of the city; that the limiting of parking to reasonable periods prevents persons from occupying the streets for private purposes and business, and prevents persons, both resident and nonresident, from storing their automobiles upon the streets, which are designed for the use of travel and traffic and not for the storage of automobiles and other vehicles; that the ordinance is in no sense a zoning ordinance, within the meaning of article 1011d, Vernon's Ann.Civ.St.; that it does not impose a restriction of the free use of the streets for which they are intended to be used by persons entitled to use the same; that it is a proper exercise of the police powers of the city and the fee charged for the use of the meter is a reasonable charge; and that the revenue derived from the meters is used and designed to be used not as a tax but for the purpose of regulating traffic and regulating the use of the streets of Wichita Falls.

The city's answer was duly verified under oath.

The Parkrite Corporation also filed an answer denying under oath all the facts alleged in plaintiff's bill of complaint as constituting grounds for equitable relief against the enforcement of the ordinance.

Upon the hearing of the application for a temporary injunction, evidence was introduced as shown in the statement of facts. While this appeal is from the refusal of a temporary injunction, the merits of plaintiff's suit for permanent relief against enforcement of the ordinance have been elaborately briefed by all parties to the suit and by attorneys for the cities of Dallas and Houston, appearing as amici curiæ, presumably because of provisions of article 4642, Rev.Civ.Statutes, making a prima facie showing of right in the applicant to a permanent injunction upon a trial of the suit on its merits, a condition precedent to the granting of the temporary writ. 24 TexJur., § 67, p. 92.

The city deraigned its title to the public streets through a deed of dedication by the fee owners of the land annexed to a plat, dated July 6, 1876, with the stipulation that the owners "do hereby make, establish and declare the annexed and foregoing plat showing blocks and lots, streets and alleys and public square as a town or City Plat to be known as Wichita Falls, situated on the Big Wichita River in Wichita County, Texas, near the mouth of Holliday Creek, hereby forever dedicating to the public use the said streets and alleys and public square as named and dedicated therein by names, letters and figures."

The city is operating under home-rule provisions of article 11, section 5, of the Constitution of Texas, giving cities of more than 5,000 inhabitants the right to adopt charters subject to such limitations as may be prescribed by the Legislature, and with the right to levy, assess, and collect such taxes as may be authorized by law or their charters.

Article 1175, Rev.Civ.Statutes, reads:

"Cities adopting the charter or amendment hereunder shall have full power of local self-government, and among the other powers that may be exercised by any such city the following are hereby enumerated for greater certainty: * * *

"16. To have exclusive dominion, control, and jurisdiction in, over and under the public streets, avenues, alleys, highways and boulevards, and public grounds of such city. * * *

"20. To license, operate and control the operation of all character of vehicles using the public streets, including motorcycles, automobiles or like vehicles."

Section 7 of the charter of the City of Wichita Falls provides that it shall have power:

"(p). To regulate and control the use, for whatever purposes, of the streets and other public places of the city;

"(r) To make and enforce local police, sanitary and other regulations;

"(s) To pass such ordinances as may be expedient;

"(t) To exercise in addition to the powers enumerated in this section, all powers that now are, or hereafter may be, granted to municipalities by the constitution or laws of the State of Texas; and all the powers of the city whether expressed or implied, shall be exercised and enforced in the manner prescribed in this charter, or when not so prescribed, then in such manner as may be provided by ordinance or resolution of the Board of Aldermen.

"(u) To have and exercise all of the powers, rights, privileges and immunities of every character and description whatsoever conferred upon and granted to cities of more than five thousand inhabitants to adopt and amend their charters by chapter 147, page 307, of the General Laws of Texas, passed by the Thirty-third Legislature of said State in 1913, and approved April 7th, 1913, as well as any and all amendments thereof heretofore or which may be hereafter adopted thereto. (Vernon's Ann.Civ.St. art. 1175 et seq.)

"Section 8. The enumeration of powers by this Charter shall not be held or deemed to be exclusive but, in addition to the powers enumerated herein implied thereby or appropriate to the exercise thereof the city shall have, and may exercise, all other powers, which, under the constitution and laws of Texas, it would be competent for this Charter specifically to enumerate, it being the intention hereof that the powers of the City of Wichita Falls shall extend to all matters of local and municipal government."

Plaintiff introduced certain excerpts from a general budget estimate of the expenditures and revenues of all city department divisions and offices, for the year beginning October 1, 1936, and ending Sep-

tember 30, 1937, prepared by the city manager and adopted by the city council before the ordinance in question was passed, all as required by the city charter. The classification made in that budget included the following items:

"(a) A detailed estimate of the expenses of conducting each department, division and office. * * *

"(f) A· statement from the director of finance of the total probable income of the city from taxes for the period covered by the estimate.

"(g) An itemization of anticipated revenues from other sources."

Followed by these estimates and recommendations.:

"This budget shows that it is not possible to balance it to meet operating and interest and sinking fund requirements, and as pointed out in the budget recently submitted. The city should endeavor to develop additional sources of revenue in order to offset losses due to homestead exemptions and other reduction in assessed valuations on real and personal property and thus overcome the deficit shown.

"A careful study of additional possible sources of revenue discloses several applicable to Wichita Falls. Division of gasoline and automobile license taxes would net some ·$50,000 per year; the filling station and gasoline pump license and tax ordinance, proven successful in several other Texas cities, would net some $5,000 per year, a revision of the malt beverage and liquor ordinances to make license non-transferrable and to allow no refunds would increase these revenues about $1,500 per year; also following the theory through that wherever possible governmental services should be self-supporting the American Society of Civil Engineers has recommended a monthly service charge or rental as a source of income to provide some funds for operation, betterments and improvement and to meet debt and service requirements of the Sewer Department. Actual operating cost of the Sanitary System, the Disposal Plant and the debt service requirement amount to about $88,408 per year, or an average of 85 cents per month per connection. The plan recommended by the American Society of Civil Engineers bases the charge on the amount of watèr used per month and in the case of the City of Fort Worth averages thirty-five (35¢) cents per customer per month, and is collected on the water bill. This

schedule would produce about $35,000 per year revenue in Wichita Falls.

"Another source of revenue which is proving more and more satisfactory in other cities is the use of parking meters. Several other cities about the same size as Wichita Falls report results very gratifying to the business, even the citizenship generally and to the City. It is estimated that at least six hundred meters would be needed here and that the revenue would be about $50,000 per year. * * *

"The City should consider the possibilities and feasibilities of developing additional sources of revenue as outlined, in order to avoid increasing property taxes, to provide funds to meet operating and dept. service requirements, to relieve traffic conditions, and whenever possible put a service on a self-supporting basis."

Section 68 of the city charter reads, in part: "Upon receipt of the budget estimate the Board of Aldermen shall prepare an appropriation ordinance using the manager's estimate as a basis."

Section 70 reads: "The Board of Aldermen may transfer any part of an unencumbered balance of an appropriation to a purpose or object for which the appropriation for the current year has proved insufficient, or may authorize a transfer to be made between items appropriated to the same office, department or divisions, where not in contravention of the constitution and laws of this State, or other provisions of this Charter."

Section 71 reads: "Any accruing revenue of the city, not appropriated as hereinbefore provided, and any balance at any time remaining after the purposes of the appropriation shall have been satisfied or abandoned, may from time to time be appropriated by the Board of Aldermen to such uses as will not conflict with any uses for which specifically such revenue accrued, and where not in conflict with the constitution and laws of this State, or other provisions of this Charter."

The meters automatically register the expiration of the time limit for occupancy of the places set apart for parking, thus lessening the duties of traffic officers to enforce such time limit, with a corresponding saving of expense to the city in enforcing the ordinance. It cannot therefore be said that the parking meter ordinance has no proper relation to traffic regulation. Moreover, it is a matter of

common knowledge that the public usually complies with such a regulation in the absence of the immediate presence of a traffic officer.

"While the proviso in Const. art. 8, § 1, that any occupation tax levied by any county, city or town shall not exceed one-half of the tax levied by the State, in effect prohibits the levy of an occupation tax by a county or municipality where the State has not levied any, this provision applies only to taxes for revenue; it does not apply to a legitimate exercise of the police power, nor to a license fee reasonably commensurate with the administrative expenses incidental to inspection and to the issuance of a license. The power to lay such a charge springs out of the police power, and it is evident that restrictions on the taxing power do not invalidate a charge that is not, in the legal sense, a tax at all. Moreover, while power to charge a fee for the exercise of a privilege may be inferred from a power to regulate, yet power to regulate does not confer by implication power to tax for revenue purposes." 40 Tex.Jur. p. 32, § 17.

"Ordinances imposing license taxes under the power to regulate are prima facie valid, and the unreasonableness of the exactions must be made clearly to appear, and they must be obviously and largely beyond what is needed for the purpose intended, before such legislation will be declared void. The fact that the exaction may result in producing a revenue in excess of that required for regulation, does not in itself destroy the regulatory character of a police measure." McQuillin on Municipal Corporations (2d Ed.) vol. 3, p. 486, par. 1102.

See, also, Ex parte Cramer, 62 Tex.Cr. R. 11, 136 S.W. 61, 36 L.R.A.(N.S.) 78, Ann.Cas.1913C, 588; City of Fort Worth v. Gulf Refining Co., 125 Tex. 512, 83 S.W. (2d) 610 (Supreme Court).

By passing the ordinance it cannot be said that the board of aldermen contemplated and intended that it should operate as an impossible tax measure. To the contrary, it must be presumed that the ordinance was passed as a police regulation as recited therein, and that the parking meter fee was intended to cover the expenses recited in section 24 of the ordinance, all of which it could lawfully do under its charter and the statutes of the state, if the regulation was not unreason-

able. Accordingly, appellant's contention that, as shown on its face, the ordinance was adopted as a tax measure and not as a traffic regulation, is without merit.

Article 1011a and others immediately following in Vernon's Texas Civil Statutes permit cities to set apart certain districts as zones for the purpose of regulating and restricting "the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes." Further provisions of that act require a public hearing of such a proposal and prior notice thereof to be published for 15 days.

Manifestly, those statutes have no application to the ordinance in question, and therefore the failure of the city to fix a date for hearing of its proposal with publication of the 15 days' notice thereof was not required.

The public streets of the City of Wichita Falls were dedicated for use by the public at large for the purpose of travel thereon.

Every citizen, including owners and nonowners of abutting property, has the primary right to the use of the streets for those purposes, and, as an incident thereto, the right of ingress and egress to and from property abutting on the streets for the purpose of loading and unloading passengers, merchandise, and other commodities on and from vehicles then used for transportation purposes. And the ordinance does not by its terms deny the citizen that right. But that primary right does not carry with it the right even in abutting property owner to store his vehicle in the street for his business convenience. West v. City of Waco, 116 Tex. 472, 294 S.W. 832; Dallas Taxicab Co. v. City of Dallas (Tex.Civ.App.) 68 S.W.(2d) 359; City of Waco v. O'Neal (Tex.Civ.App.) 33 S.W.(2d) 205 (writ refused) and cases cited; Greene v. City of San Antonio (Tex. Civ.App.) 178 S.W. 6 (writ refused); City of San Antonio v. Fetzer (Tex.Civ.App.) 241 S.W. 1034 (writ refused); Waid v. City of Fort Worth (Tex.Civ.App.) 258 S.W. 1114 (writ refused); 39 Tex.Jur. pp. 606 to 611, inclusive, and cases cited; including City of Waco v. Powell, 32 Tex. 258; Taylor v. Dunn, 80 Tex. 652, 16 S.W. 732; Davis v. Commonwealth of Mas-

sachusetts, 167 U.S. 43, 17 S.Ct. 731, 42 L. Ed. 71; Parsons v. City of Galveston, 125 Tex. 568, 84 S.W.(2d) 996.

The following is quoted from 44 Corpus Juris, § 3867, p. 1026: "The primary purpose for which streets are established is for the use of the public as a highway for travel and transportation; and an easement of a street for highway purposes gives the public the right to pass over the street for every purpose of travel and traffic and to move property thereover in a reasonable manner, so long as it does not impose an additional servitude upon the fee. This right to use the streets everyone is entitled to enjoy in pursuit of his lawful business, convenience, or pleasure upon terms of equality with others, and without hindrance or annoyance from others. The right to travel on and along the streets of a municipality applies to the general public and not to its citizens alone; it is an inherent and inalienable right of every citizen of the state, which neither the state nor municipality can take away or unreasonably abridge, and which may only be controlled by reasonable regulation."

In the exercise of its charter powers, the governing body of the city may pass reasonable police regulations even of the primary use of the streets and may even vacate, abandon, and close any such streets, alleys, avenues or boulevards when such action is for the best interest of the city. Article 1175, subd. 18, Vernon's Texas Civil Statutes; Johnson v. Lancaster (Tex.Civ. App.) 266 S.W. 565; 44 C.J., § 3614, p. 893.

But as long as a public street is recognized as such, the governing body of the city is without authority to deny any citizen his primary right of its use.

Subordinate to that primary right in the general public, every citizen has a further and secondary right to use the public streets, subject to the powers vested in the city by its charter and statutes. That secondary right is permissive in character, of indefinite duration, and may be restricted, limited, modified, and terminated by ordinances coming within the scope of the statutory and charter powers of the city, and enacted for the public good.

The ordinance in question was within the general charter powers of the city and the provisions of article 1175, Rev.Civ.Statutes. It is not a tax measure and therefore is not forbidden by the provisions of the city charter. It does not deprive plaintiff of his primary right in the use of the public street, which is his only vested right.

We quote the following from 6 R.C.L., § 87, p. 89, and § 103, p. 103, which is supported by a multitude of decisions of the Supreme Court of the United States and of many state courts:

"Before a law can be attacked by any person on the ground that it is unconstitutional, he must show that he has an interest in the question in that the enforcement of the law would be an infringement on his rights. One who is not prejudiced by the enforcement of an act of the legislature cannot question its constitutionality, or obtain a decision as to its invalidity on the ground that it impairs the rights of other. * * *" Section 87, p. 89.

"The general principles as to the presumption in favor of the constitutionality of enactments of the legislative department of the government apply not only to acts of the legislature, but to the action of all law-making bodies. They have been applied to acts of Congress, to statutes adopted by state legislatures, and to ordinances. Where the legislature has enacted a regulation for the benefit of the public or some general class thereof, and the regulation is assailed as an interference with property rights or with the right to contract, a similar presumption arises in favor of the validity of the legislative action. While it must be remembered that the common law requirement as to the reasonableness of ordinances is on a different basis from the constitutional limitation against unreasonable legislation in the exercise of the police power, the courts are inclined to indulge the same general presumption in favor of the legality of legislation in the case of ordinances and bylaws of municipal corporations, as in the analogous instance of acts of the legislature. The right of the municipal authorities to decide on the reasonableness of regulations established by the corporation is generally recognized, and their decision is treated as controlling on the courts, unless the unreasonableness of the ordinance is fairly free from doubt." Section 103, p. 103.

What is a reasonable police regulation must be determined from surrounding conditions and circumstances which necessarily vary in different localities. 2

McQuillin on Municipal Corporations, § 730.

In 19 R.C.L. § 113, p. 807, this is said: "In determining what is reasonable, much must depend upon the requirements of different localities, the density of population of the town in which the ordinance has been enacted and the dangers and evils prevalent therein, and what would be reasonable in one place might be highly unreasonable in another. A municipal ordinance should not be looked upon by the courts with as much respect as the enactment of a co-ordinate department of the government of the state, but none the less a court should not strike down a municipal ordinance as unreasonable merely because it disagrees with the wisdom or expediency of the ordinance or the policy which it reflects. It is well settled that when an ordinance is passed relating to a matter which is within the legislative power of the municipality, all presumptions are in favor of its validity to establish that fact. Thus when the validity of an ordinance depends upon the existence of one or more facts at the time of the enactment thereof, the existence, and not the nonexistence, of the necessary facts to sustain the validity of the ordinance should be presumed, in the absence of evidence to the contrary. So also a municipal ordinance will be presumed to be reasonable unless the contrary appears on its face or is established by evidence."

See, also, 2 McQuillin, §§ 731, 732.

"In the exercise of its police powers the courts will not interfere with the action of the governing body of the corporation where the regulations provided are adapted to the object sought and are not manifestly unreasonable. The courts will not disturb a police municipal regulation where there is room for a difference of opinion of whether or not the public safety or welfare is promoted by its provisions. Where two constructions are possible, one which will sustain the regulation or ordinance and the other which will defeat it, the court will adopt the construction sustaining it." 43 C.J. p. 307.

"While the very foundation of the police power is the control of private interests for the public welfare, the municipal police power must be so exercised as not to infringe arbitrarily or unreasonably upon private rights, whether they are of person or property. Theoretically at least, there can be no conflict between the exercise of purely police power and constitutional inhibitions, as the legitimate scope of one ends where the other begins; and so long as municipal bodies confine their enactments within the proper limits of such power, they do not violate the private rights of the individual. The limit imposed is that the requirements, whatever they may be, must be reasonable, and for the protection of property, the public health, the public morals, the public safety, or the welfare of the inhabitants of such municipality. So a municipal regulation is not rendered invalid by the mere fact that private rights are subjected to restraint or that loss will result to individuals from its enforcement." 43 C.J. p. 230, § 230.

Among the many decisions cited in support of that text is Halsell v. Ferguson, 109 Tex. 144, 202 S.W. 317, 321, in which the owner of property abutting on a public street attacked the validity of a city ordinance requiring buildings to conform their frontage to the frontage of lots whenever the lots are so platted as to show a frontage on any street or avenue in the residence portion of the city. Overruling that attack, the court said:

"Since these regulations appear reasonable, and since they promote the general convenience and the public welfare, we cannot regard them as subject to attack on constitutional grounds.

"Coming within the police power, appellants have to submit to these regulations, without regard to compensation. For, as announced in section 442, Corpus Juris, vol. 12, p. 931: 'Since the very foundation of the police power is control of private interest for the public welfare, a statute or ordinance is not rendered unconstitutional by the mere fact that private rights of person or property are subject to restraint or that loss will result to individuals from its enforcement.'"

In 2 McQuillin, p. 1615, this is said: "Every right, from an absolute ownership in property down to a mere easement, is purchased and holden, subject to the restriction that it shall be exercised so as to not injure, inconvenience or discommode others."

We quote the following from a footnote to that text: "Laws and ordinances relating to the comfort, health, convenience, good order and general welfare of the inhabitants, are comprehensively styled police laws, and it is well settled that laws

and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional (Venner v. Chicago City Ry. Co., 246 Ill. 170, 92 N.E. 643 [138 Am.St.Rep. 229, 20 Ann. Cas. 607]; Chicago v. Weber, 246 Ill. 304, 92 N.E. 859 [34 L.R.A.(N.S.) 306, 20 Ann.Cas. 359]), though no provision is made for compensation for such disturbances. The principle was applied to an ordinance relating to use of water, which in effect compelled the water taker to bear the expense of putting in the meter. Hill v. Thompson, 16 J. & S. (48 N.Y. Super.Ct.) 481, 489."

"Primarily one has no right permanently to use or occupy any portion of a public street to the exclusion of others, or to use it as a place of business. But a municipality may grant the use of a street or sidewalk to a person for private use, and may charge a fee therefor, when this will not interfere with its use by the general public. Thus when empowered by its charter or a statute, a franchise or privilege may be granted to occupy and use portions of the streets of a city for the purpose of conducting a business or enterprise furnishing some public service. 39 Tex.Jur. § 75, p. 619.

"The right of the public at large is paramount to that of an individual, and the right of the latter must yield in case of a conflict. Thus a person has no inherent right to use a street as a place of business, for a habitation or pasture, or for anything except to travel on or over, anymore than he has to use any property that is not his own for such purposes." 39 Tex.Jur. § 63, p. 607.

In support of that text the following cases are cited: Dallas Taxicab Co. v. City of Dallas (Tex.Civ.App.) 68 S.W. (2d) 359 (writ refused); City of San Antonio v. Fetzer (Tex.Civ.App.) 241 S.W. 1034 (writ refused).

In Dallas Ry. & Terminal Co. v. Bankston (Tex.Com.App.) 51 S.W.(2d) 304, 306, this is said in an opinion by Justice Sharp: "Modern conditions demand that municipalities must of necessity be permitted reasonable latitude in the exercise of their police powers. The authorities sustain the view that the powers given cities are broad enough to authorize the enactment of ordinances and rules regulating traffic upon public streets, and to impose reasonable restraints to protect the welfare of the public in the proper use of the streets."

In City of Fort Worth v. Gulf Refining Co., 125 Tex. 512, 83 S.W.(2d) 610, 611, opinion by Chief Justice Cureton of the Supreme Court, this is said:

"This case is before us by writ of error. It involves the validity of an ordinance of the plaintiff in error providing an annual charge of $24 for the right to operate each gasoline filling station in the city. * * *

"In the first place, the ordinance in section 1 prohibits the erection of filling stations on certain named streets. In the second place, a permit is required as to all erections where filling stations are lawful. The provisions of this ordinance, read in connection with those of Ordinance Nos. 725 and 494, leave no room for doubt that its purpose, too, is regulatory. The charge here involved is found in section 2 of one of the three ordinances regulating the filling station business. It is a part and parcel of the city's regulatory system, and unless the charge is unreasonable, its validity must be sustained. The amount of this charge, viz., $24 per annum for each filling station, is under the law prima facie valid, and unless its unreasonableness has been made to appear it must be sustained. McQuillin on Municipal Corporations (2d Ed.) vol. 3, p. 486, § 1102 As said by the authority cited: 'Ordinances imposing license taxes under the power to regulate are prima facie valid, and the unreasonableness of the exactions must be made clearly to appear, and they must be obviously and largely beyond what is needed for the purpose intended, before such legislation will be declared void. The fact that the exaction may result in producing a revenue in excess of that required for regulation, does not in itself destroy the regulatory character of a police measure.' * * *

"As to the reasonableness of a license fee, the rule is that the sum levied cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and exercising proper police regulation; or, as stated in another way, the sum levied should bear some reasonable relationship to the legitimate object of the licensing ordinances. McQuillin on Municipal Corporations (2d Ed.) vol. 3, p. 483, § 1102; Texas Jur. vol. 27, p. 893, § 47. The rule is stated by McQuillin as follows:

" 'Where the exaction is imposed under the power to regulate or in the exercise of the police power, as distinguished from the power to tax for revenue, as heretofore explained, the general rule obtains that the sum levied cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and of exercising proper police regulation. The nature of the business sought to be controlled and the necessity and character of police regulations are the dominating elements in determining the reasonableness of the sum to be imposed. * * *

" 'The judicial view is that much should be left to the discretion of the municipal authorities. Where under undoubted charter power, the tax is imposed for revenue alone, or for police regulation and revenue, the amount thereof is usually a matter for determination by the legislative branch of the municipal government. Ordinarily the courts will decline to interfere on the ground that the amount is oppressive or unreasonably large. They incline to defer to the judgment and discretion of the corporate authorities, and frequently presume that the amount demanded is reasonable, particularly in the absence of evidence to the contrary.'

"In Texas Jurisprudence, just cited, the rule is thus stated: 'The constitution contains no provision specifically limiting the amount of a charge which may be imposed by way of a license fee, it being sufficient that such a charge is reasonable for purposes of regulation when tested by general constitutional guaranties.' "

To the same effect are Davis v. City of Taylor, 123 Tex. 39, 67 S.W.(2d) 1033; Parsons v. City of Galveston, 125 Tex. 568, 84 S.W.(2d) 996; Clark v. City of Athens (Tex.Civ.App.) 253 S.W. 574 (writ of error denied); Scruggs v. Wheeler (Tex. Civ.App.) 4 S.W.(2d) 616 (writ of error refused); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, Ann.Cas. 1917B, 927.

In Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.(2d) 475, 478, the Supreme Court quoted with approval the following from 30 Texas Jurisprudence, p. 120, § 58: "All property is held subject to the valid exercise of the police power; nor are regulations unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. The infliction of such loss is not a deprivation of property without due process of law; the

exertion of the police power upon subjects lying within its scope, in a proper and lawful manner, is due process of law."

The court further said:

"The rule is that in order to hold a statute void we must be able to say that is is clearly unconstitutional and to hold an ordinance invalid it must be clearly and plainly unreasonable. * * *

"Or as stated by the Supreme Court of Illinois in Daniels v. Hilgard, 77 Ill. 640: 'The question, whether certain requirements are a part of a system of police regulation adapted to aid in the protection of life and health, is properly one of legislative determination, and a court should not lightly interfere with such determination, unless the legislature has manifestly transcended its province.' "

We quote also from the opinion in Miks v. Leath (Tex.Civ.App.) 26 S.W.(2d) 726, 729: "A city's regulation, relative to the use of the streets by vehicles, which is within the scope of its charter powers, is not inhibited by state law or the Constitution, unless there is a conflict."

Also the following from opinion in Standard Oil Co. v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856:

"Fairly debatable questions as to its reasonableness, wisdom, and propriety [of the ordinance] are not for the determination of courts, but for that of the legislative body on which rests the duty and responsibility of decision. * * *

"We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the conclusion of the legislative body, nor may we set aside the ordinance because compliance with it is burdensome. * * * It does not preclude petitioners from locating their storage tanks without the city limits."

Plaintiff's ingress and egress to and from his place of business is not obstructed by the one meter in front of it. Prior to the passage of the ordinance, the same parking and for the same length of time was allowed without charge therefor. It was so alleged in the petition. His chief complaint is that on account of the parking fee now required he has lost patronage of many of his customers who are unwilling to pay the fee, and therefor go elsewhere to shop. According to allegations in his bill of complaint and his testimony at the hearing, the only difference between the burdens of the old ordinance and the present is the charge

of 5 cents as a parking fee, which he complains is excessive and therefore an unreasonable police regulation.

The facts recited in the ordinance as reasons for its enactment must be accepted as true, in the absence of sufficient evidence to overcome them. The facts so found by the city council as reasons for enacting the ordinance are matters of common knowledge in cities of large population, such as Wichita Falls, of which courts may take judicial cognizance. It is also a matter of common knowledge that the public will more readily park vehicles in places where no charge is made therefor than otherwise. It is manifest, therefore, that parking meter charges may operate to plaintiff's advantage in lessening the occupancy of the parking space in front of his place of business by others than his customers at times when needed by those desiring to trade with him.

If in the operation of the meters more money is realized than necessary to pay expenses incident thereto, then, under the terms of the ordinance, the city had the right to apply the excess "to cover the cost of inspecting and regulating traffic involved in the proper control of the traffic upon the streets of the City of Wichita Falls," as well as the cost of "inspection, installation, operation, control and use of the parking meters and parking spaces described herein and involved in the checking up and regulating of the handling of the traffic and the parking of vehicles in the parking meter zones hereby created."

The right to use such collections for the purposes first stated, as well as for the second, is within the powers of the general control of the public streets, authorized by the home-rule provisions of the Constitution, in connection with provisions of article 1175, Rev.Civ.St., and powers vested in the city by its charter. The parking fee charged is not a tax but is a license fee for a privilege not possessed by the citizens, and is properly chargeable for regulatory purposes under the police powers of the city. Berry on Automobiles, §§ 78 and 79; 1 Blashfield's Encyclopedia Automobile Law, § 5, p. 178; 44 C.J. par. 3841, p. 10; 39 Tex.Jur. pp. 63, 74, pars. 606–619; 43 C.J. par. 221.

There are no allegations in plaintiff's petition that revenues collected were in excess of the expenses required for the first stated purposes as well as for the second. Nor did plaintiff allege facts to serve as a basis for his claim that the parking fees were in excess of the amount required for the installation and operation of the meters; the general allegation of excessiveness for that purpose being a mere conclusion of the pleader and therefore insufficient.

Only three decisions are cited involving the validity of municipal parking meter ordinances. One is Ex parte Duncan, 65 P. (2d) 1015, by the Supreme Court of Oklahoma. In that case the court denied the application of Duncan for release from the city jail where he was being confined after conviction for violation of a parking meter ordinance enacted by Oklahoma City. The validity of the ordinance was challenged, but the court held it to be a reasonable police regulation. Another of those decisions was by the Supreme Court of Florida, date December 10, 1936, styled State ex rel. Irvin W. Harkow, Relator, Plaintiff in Error, v. W. J. McCarthy, Chief of Police, of the City of Miami, Defendant in Error, 171 So. 314, 317. The case came before the Supreme Court in a habeas corpus proceeding remanding the relator to the custody of the chief of police to pay the penalty assessed against him for violating a municipal parking ordinance, which was attacked by Harkow on the ground that it was unreasonable and amounted to taking property without due process of law, and was an abuse of the police powers for the purpose of raising revenues. The ordinance fixed spaces in the streets for parking vehicles, with a limit of 30 minutes within which they could remain by the payment of a meter fee of 5 cents. The court sustained the contention of the city that it was apparent upon the face of the ordinance that it was a reasonable police traffic regulation and not designed as a tax raising measure, and in affirming the judgment of the district court had this to say:

"In the case of Frost & Frost Trucking Co. v. R. R. Commission of California, 271 U.S. 583, 46 S.Ct. 605, 610, 70 L.Ed. 1101, 47 A.L.R. 457, Mr. Justice McReynolds observed that: 'The states are now struggling with new and enormously difficult problems incident to the growth of automotive traffic, and we should carefully refrain from interference unless and until there is some real, direct and material infraction of rights guaranteed by the federal Constitution.'

"This observation is equally applicable to the cities of Florida today."

The meter ordinances involved in those two cases were substantially the same as the one now before us, which is also true in the third case, styled City of Birmingham v. Hood-McPherson Realty Company, decided by the Supreme Court of Alabama, 233 Ala. 352, 172 So. 114, 118. In that case the Supreme Court affirmed the judgment of a trial court enjoining the enforcement of a parking meter ordinance of the City of Birmingham, the suit being by appellee, the owner of property abutting on a public street. We quote the following from that opinion: "When complainant's insistences are reduced, they are, in effect, that its property is being taken without due process of law under the ordinance challenged and its administration shown by the evidence. That is to say, the valuable personal and property rights appurtenant to and necessary in the ownership of lands abutting on a highway are violated by the physical obstructions provided for and permitted on the street by the ordinance alongside of complainant's property contrary to the well-considered and adjudicated cases (First National Bank v. Tyson, 133 Ala. 459, 32 So. 144, 59 L.R.A. 399, 91 Am.St. Rep. 46) ; that complainant's right of property and the right use thereof are denied, in that the free and unobstructed use of ingress and egress from the street to the sidewalk and its property is denied to complainant without the payment of the charge fixed by the ordinance; that those of the general public desiring to park and go to complainant's place of business are denied such privilege by the obstruction of cars parked there for compensation, or are denied for failure of payment of the required price for such parking privilege; and that the ordinance permits an unnecesary and unlawful burden on adjacent property owners, in the exercise of the police power of government—that is, a continuing indirect tax imposed upon the use of the street which is not a lawful exercise of the taxing or police power of municipal government."

It was then pointed out that the city's right to the streets was derived through an original deed of dedication from the Elyton Land Company to the mayor and alderman of Birmingham, with these provisions: "To have and to hold the above described and dedicated streets, avenues and alleys as aforesaid with appurtenances to the said Mayor and Alderman of Birmingham to be kept by said 'Mayor & Alderman of Birmingham' for the benefit and use of the public, and it is expressly stipulated that said streets, avenues and alleys shall not be used for any private or individual purposes except with the consent of the 'Elyton Land Company.' The intention of this deed is to confirm the dedication heretofore made by the 'Elyton Land Company' to the 'Mayor and Alderman of Birmingham' of the said streets, alleys and avenues (with the exception aforesaid) to be kept by said 'Mayor and Alderman of Birmingham' as the streets, avenues and alleys of the city and used alone as such for the benefit of the public and the said 'Mayor and Alderman of Birmingham' accepts the trust as intended and agrees to carry out the trust according to the above intent and purpose and not otherwise. And it is further understood that this conveyance shall not be construed to convey said streets, alleys and avenues, except to be kept and used alone as such for the benefit of the public, and for no other use and benefit whatever without the consent of said 'Elyton Land Company.' "

The opinion of the court reviews at great length former decisions of the Supreme Court of Alabama and the constitution of the state, together with a discussion of the general powers of municipalities to regulate and control their public streets. But the following excerpts from the opinion show that the decision was based on the restriction in the deed of dedication of the streets rather than on general principles otherwise applicable:

"Many acts of the Legislature confer on cities the power of regulation of streets by means of signaling devices, Gen.Acts 1927, p. 377, Code 1928, § 1397 (79), subsec. (d) ; the power to regulate the running of trains, etc., and prohibit the standing of vehicles, engines, or automobiles, etc., on streets, Code, § 2308; the power to regulate or prohibit parking of vehicles except as indicated, Gen.Acts 1927, p. 377, Code, § 1397 (79), subsec. (e) ; to control and regulate the use of the streets 'for any and all purposes,' section 2016, Code 1928; and to license and regulate the use of the streets of cities by persons who use vehicles or solicit or transact business thereon, section 2163, Code 1928; City of Mobile v. Farrell et al., 229 Ala. 582, 158 So. 539; City of Mobile v. Gentry, 170 Ala. 234, 54 So. 488, cited in 37 L.R.A.(N.S.) page 440, note. These statutes are not here for consideration or decision of the question presented.

"The City of Birmingham has powers different from those enjoyed by other cities in the state, in that the Legislature conferred upon that municipality the police power. Mitchell v. City of Birmingham, 222 Ala. 389, 133 So. 13; Fitts v. Commission of City of Birmingham et al., 224 Ala. 600, 141 So. 354; Gen.Acts 1915, p. 296, § 6.

"This extended power cannot, however, change the terms of the grant dealt with, the trust imposed for the benefit of the general public, or ignore the personal and property rights under the Constitutions to the properties in question."

And the final conclusion reached is stated as follows: "We hold that the ordinance enacted and sought to be enforced was an unauthorized abandonment of the terms of the Elyton Land Company's deed of dedication; that its execution deprives complainant of its property without due process; and that its administration was and is an unauthorized exercise of the taxing power."

The absence of any restrictions in the deed of dedication of the public streets of the City of Wichita Falls, such as those appearing in the deed of dedication by the Elyton Land Company to the City of Birmingham, which apparently were given controlling effect in the Alabama case, distinguishes that case from the present suit.

This is said in appellant's brief: "No one will say that the City has not the right to regulate traffic on the street, or that in emergency to even close the street, or to deny anyone the right to park or stop on the street. However, this is limited to emergencies. But we do vigorously deny the City the right or power, as trustee for the public, to charge the public a fee for the enjoyment of the streets which were dedicated to that very purpose and object. There is a vast difference between closing a street for an emergency and charging the public for the normal use of such street. If a citizen is permitted to park on the street at all, he can park free. If he can travel the street at all, he can travel it free."

In support of that contention appellant stresses certain announcements of general principles appearing in several cases already noted, such as Greene v. City of San Antonio (Tex.Civ.App.) 178 S.W. 6; City of San Antonio v. Fetzer (Tex.Civ.App.) 241 S.W. 1034, 1035; Davis v. City of Houston (Tex.Civ.App.) 264 S.W. 625, 629;

also Ex parte Battis, 40 Tex.Cr.R. 112, 48 S.W. 513, 43 L.R.A. 863, 76 Am.St.Rep. 708; Decker v. City of Wichita, 109 Kan. 796, 202 P. 89; Hadfield v. Lundin, 98 Wash. 657, 168 P. 516, L.R.A.1918B, 909, Ann.Cas.1918C, 942. He further insists that the city has no authority to levy a tax or impose a license on any person, except a public utility for the use of a public street or any driveway from private property to such street or avenue.

We believe the broad powers vested in the City of Wichita Falls as a home-rule city by our Constitution and article 1175. Rev.Civ.Statutes, and its charter, furnish a complete answer to the contention so made; regardless of any general rule of decisions of a contrary import applicable to municipalities not vested with such comprehensive powers.

There is no merit in the assignment challenging the ordinance on the ground that it is in violation of public policy and therefore void in that as one of the considerations for the purchase of the meters from the Parkrite Company the city agreed to assess a penalty for violation of the provisions of the ordinance, since, as shown by the recitals in the ordinance, it was passed as a reasonable police regulation independently of that provision in the contract for the purchase of the meters; and this is not a suit to enforce that contract of purchase.

We will add that, at most, plaintiff could have no right to restrain the enforcement of the ordinance, as to all others than himself, who may not object thereto, and whose necessities may not require such. An invalidation of the ordinance in its entirety, as sought, would be going too far if not necessary to the protection of his right of ingress and egress to and from his place of business. City of Shawnee v. Robbins Bros. Tire Co., 134 Okl. 142, 272 P. 457, 66 A.L.R. 1047. Nor did plaintiff institute the suit for the benefit of himself and all other property owners similarly situated.

For the reasons noted, all assignments of error are overruled and the judgment of the trial court refusing the temporary writ of injunction is affirmed, but without prejudice to the merits of plaintiff's suit for the permanent injunctive relief prayed for in his petition upon final trial of the suit.