[Civil No. 4408.   Filed June 9, 1941.]

[113 Pac. (2d) 935.]

CITY OF PHOENIX, a Municipal Corporation, Petitioner, v. THAD MOORE, D. C. O'NEIL and WARREN PETERSON, as Members of the State Tax Commission of Arizona, Respondents.

Mr. Hess Seaman, City Attorney, Mr. William C. Fields and Mr. Henry S. Stevens, Assistant City Attorneys, for Petitioner.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley, Assistant Attorney General, for Respondents.

ROSS, J.—This is an original proceeding by *certiorari* brought by the City of Phoenix against the

State Tax Commission questioning the latter's right to levy, assess and collect certain taxes from the city under the Excise Revenue Act of 1935, as amended. Chapter 77, Laws of 1935 as amended, §§ 73–1301 to 73–1334, Arizona Code, 1939.

According to the petition, the tax commission is claiming, and threatening to collect from the city, taxes on gross sales, for the period from May 1, 1935 to January 31, 1941, covering:

| | |
|---|---|
| Advertising space | $ 272.38 |
| Bus fares | 4,950.74 |
| Street car fares | 11,832.22 |
| Parking meters | 4,816.24 |
| Swimming pools | 492.86 |
| Golf course | 1,647.23. |

It is alleged that the commission, in its attempt to collect the tax from the city on its street car fares, its parking meters, swimming pools and golf course, is exceeding its authority and acting without and in excess of its jurisdiction.

The commission's answer puts at issue the allegations of the petition as to petitioner's nonliability for such taxes, and that is the question for decision.

We first consider whether the city is liable for a tax on its receipts from passenger fares over its street railway. The right to collect such tax is asserted by the commission under section 73–1303, Arizona Code, 1939. It is provided therein:

"From and after the effective date of this act, there is hereby levied and shall be collected by the tax commission . . . annual privilege taxes measured by the amount or volume of business done . . . to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the following schedule:

. . . . . . . . . . . . . . .

"(c) At an amount equal to one per cent of the gross proceeds of sales or gross income from the busi-

ness upon every person engaging or continuing within this state in the following businesses:

. . . . . . . . . . . . . . .

"4. Transporting for hire freight or passengers by railroads from one point to another point in this state."

Geographically the Phoenix street railway is covered by this provision and, if it is a railroad, it is required to pay the tax. The controversy is over the meaning of the word "railroads." The city contends that the word means purely commercial railroads such as the Santa Fe and Southern Pacific, whereas the commission contends that as here used it also means a street railway.

The word "railroad" is generic and is broad enough to include street railways. 22 R. C. L. 745, § 5; 51 C. J. 407, § 3, note (a). Whether it does depends upon the context in which it is used. A street railway is a public utility. In that respect it is classed with commercial railroads, electric light plants and water works. From all these the state collects the excise tax, and the language of the statute is broad enough to include the receipts of the city from sales of fares on its street railway. We are not now considering the difference in the functions of street railways and commercial lines and the laws regulating them but are thinking of them as taxpayers equally protected and therefore equally bound to support the government. Should one pay an excise tax on the fares it collects and the other not? Did the legislature intend to make such discrimination? There is nothing in the language it used to show any such favoritism. On the contrary, the language used would indicate that the legislature intended that all intrastate railroads should pay the excise tax.

No contention is made that the city is exempt from the tax on constitutional grounds or others, if the word "railroad" includes the city's street railway.

The city, in operating a public utility, does so in its proprietary capacity and may be made to pay the excise tax on its business if the legislature so declares. *City of Phoenix* v. *State of Arizona,* 53 Ariz. 28, 85 Pac. (2d) 56.

The tax levy on rentals of parking meters by the city is made under subsection (f) 2 of section 73–1303, *supra,* wherein, among other businesses, persons operating the business of "parking lots" or "charging storage fees or rents" are made liable for a 2% tax on their gross income or proceeds. The word "person" includes municipal corporations. § 73–1302, Id. Parking meters, under authority of an ordinance passed by the city, have been installed in certain sections of Phoenix where the traffic is heaviest and most congested, for the purpose of policing and regulating such traffic during the busiest parts of the day. Under the ordinance, within the parking zone a traveler may park his car for one hour for five cents in places indicated by white lines. An automatic meter contains devices that register when the coin is deposited and also the expiration of the one-hour period. Thus this automatic device does the work that was formerly done by police officers under city ordinances. In other words, the meters are mechanical policemen. Violation of the provisions of the ordinance authorizing the parking of automobiles in spaces indicated is enforced by appropriate fines. The revenues derived are designated as a special fund to be used in installing the parking system, its maintenance after installation and to enforce traffic regulations, and in furtherance of the program of the city for the safe use of its streets by automobiles, motor vehicles and pedestrians. Clearly, the ordinance has for its purpose the regulation of a perplexing problem to cities and towns, created largely by the advent of motor vehicles.

That the city's charter and the general laws empower the city to enact such ordinance is not questioned. Sections 1 and 2, Chapter IV, Phoenix City Charter; sections 16–601 and 66–114, Arizona Code, 1939.

It is urged, however, that the ordinance is a revenue and not a regulatory measure, this contention being asserted by reason of the size of the fee charged. The fee seems to be the regulation fee of cities that have adopted the automatic meter parking and in none of the cases involving its validity has the ordinance been held invalid on account of the size of the fee. We have no way of knowing whether the five cents charged is more than the cost to the city for the same service performed in the old way by policemen, and cannot, as against the declaration of the city ordinance, hold that it is. *Prima facie* at least, the fee fixed by the ordinance should be accepted as the cost of the service. *Hendricks* v. *City of Minneapolis,* 207 Minn. 151, 290 N. W. 428; *Kimmel* v. *City of Spokane* (Wash.), 109 Pac. (2d) 1069.

The Kimmel case is the most recent that we have found passing upon the question involved. We think it cites all the cases found in the reports up to February 3, 1941, with the exception of *City of Columbus* v. *Ward,* 65 Ohio App. 522, 31 N. E. (2d) 142, which sustains the meter parking ordinance of Columbus. We quote from the Kimmel case [109 Pac. (2d) 1071], the following, and approve of it:

"Ordinances prescribing time limitations on parking have long been recognized as a proper exercise of the police power, both in the interest of the occupant of abutting property and of the traveling public. Such limitations are designed to keep traffic moving, to minimize congestion, and, at the same time, to afford users of the highways an opportunity to transact business with the occupants of abutting property. Time

limitations upon parking have been necessitated by abuse of the privilege. It is obviously to the interest of the occupant of abutting property that such time limitations be strictly enforced, for the shorter the limitation and the more effectually it is enforced, the greater is his freedom of access to his premises.

"It strikes us that the parking meter is admirably designed to accomplish that result. We fail to see what difference it can make to either the traveler on the street or to the occupant of abutting property whether the time limitations be enforced by a policeman marking cars with a piece of chalk or by a mechanical device that registers 'Time's up' in a way that all may see. The object of both is to prevent overtime parking, and, of the two, it seems to us that the latter is more effective. With the latter, there are no minutes of grace as there are with the policeman while he is making his rounds 'marking' and 'checking up,' for the time begins to run when the car is parked, and ends when the meter registers 'Time's up.' That parking meters will diminish the vice of overtime parking and, consequently, speed up traffic, seems a certainty, for the car must be moved at the expiration of the time limited. 'Repeating' by deposit of another coin is not permitted. We are convinced that ordinance C6860, providing for their installation and maintenance, is a valid exercise of the city's police power.

"Similar ordinances have had the consideration of the courts of a number of other states. There is a diversity of opinion as to their validity. They are sustained, we believe, by the weight of authority,— certainly by the weight of reason. *State ex rel. Harkow* v. *McCarthy*, 126 Fla. 433, 171 So. 314; *Ex parte Duncan*, 179 Okl. 355, 65 Pac. (2d) 1015; *Opinion of the Justices to the Senate and the House of Representatives*, 297 Mass. 559, 8 N. E. (2d) 179; *Hendricks* v. *City of Minneapolis*, 207 Minn. 151, 290 N. W. 428; *Gilsey Buildings, Inc.*, v. *Incorporated Village of Great Neck Plaza*, 170 Misc. 945, 11 N. Y. Supp. (2d) 694; *Clark* v. *City of New Castle*, 32 Pa. Dist. & Co. R. 371; *Owens* v. *Owens*, 193 S. C. 260, 8 S. E. (2d) 339; *Harper* v. *City of Wichita Falls*, (Tex. Civ. App.) 105 S. W.

(2d) 743; *Ex parte Harrison,* 135 Tex. Cr. R. 611, 122 S. W. (2d) 314; *County Court of Webster County* v. *Roman,* W. Va. 3 S. E. (2d) 631.

"The following decisions deny the power to regulate traffic by the installation and maintenance of parking meters: *City of Birmingham* v. *Hood-McPherson Realty Co.,* 233 Ala. 352, 172 So. 114, 108 A. L. R. 1140; *City of Shreveport* v. *Brister,* 194 La. 615, 194 So. 566; *Monsour* v. *City of Shreveport,* 194 La. 625, 194 So. 569; *In re Opinion to the House of Representatives,* R. I., 5 Atl. (2d) 455; *Rhodes, Inc.,* v. *City of Raleigh,* 217 N. C. 627, 9 S. E. (2d) 389, 130 A. L. R. 311.''

We are satisfied, from the opinions in the Louisiana and Rhode Island cases, that the decisions would have been different if the charters there involved had included the necessary authority to pass parking meter ordinances. The great weight of authority sustains the validity of ordinances providing for such traffic regulation by a city of its streets.

The tax commission claims the income or proceeds from admission fees to the city swimming pools and golf course are taxable at 2% under subsection (f) 1 of section 73–1303 reading:

"1. Operating or conducting theatres, movies, operas, shows of any type or nature, exhibitions, concerts, carnivals, circuses, amusement parks, menageries, fairs, races, contests, games, billiard and pool parlors and bowling alleys, public dances, dance halls, boxing matches and wrestling matches, and any business charging admission fees for exhibition, amusement or instruction, other than projects of *bona fide* religious or educational institutions.''

The petitioner resists such claim on two grounds: (1) that its swimming pools and golf course are integral parts of the city's parks, playgrounds and recreational areas and were installed and are maintained and operated without any "object of gain, benefit or advantage either direct or indirect" (§ 73–1302, *in-*

*fra*), and (2) that such activities are governmental and not proprietary and therefore not taxable.

It will be noticed that the tax is on "the gross proceeds of sales or gross income from the business," and in the preceding section (73–1302) we have this definition of "business":

" 'Business' includes all activities or acts, personal or corporate, engaged in or caused to be engaged in with the object of gain, benefit or advantage either direct or indirect, but not casual activities or sales."

There is no showing that the city's parks, playgrounds, swimming pools and golf course are operated for profit. On the contrary, it appears that, of the four swimming pools operated and maintained by the city, two (Eastlake Park and the one at Grant Street) make no charge whatever. For the years 1935, 1936, 1937, 1938, 1939 and 1940 the cost of operating the swimming pools exceeded the gross income by $12,-406.96. For the same years (except 1935) the cost of operating the golf course has been $24,028.49 more than the gross income therefrom. In the report of the superintendent of parks is found this statement:

"The charges are fixed by the Board and myself (the Superintendent of Parks) and in both cases are the lowest in the country. At the two swimming pools, University and Coronado, the fees are 5¢ for children from 10: to 12: A. M. and 10¢ thereafter. The charge for adults is 15¢ at all times. Fees on the golf course are 25¢ for Junior College and high school students; 50¢ for adults for 18 holes any time except Saturdays, Sundays and Holidays, when the fee is $1.00 in winter time and 75¢ in summer time. The fees are not determined by the cost of maintenance. This department is not operated for direct profit, the theory being to offer healthful recreation in an effort to reduce the juvenile delinquency, thereby lowering the cost of salaries for probation officers, police department and jail maintenance."

This is the only evidence we have and, from it, it is clear the city's department of parks is operated in the interests of the community and with no thought of gain. Chapter 22 of the city charter makes provision for the creation of the city's public parks, playgrounds, etc., and the only appropriation therein for their support is found in section 3. Such appropriation is six and one-half cents per hundred dollars of the assessed value of all real and personal property of the city. This appropriation, together with the fees collected, is used for the expansion, from time to time as the city's needs demand, of the parks, playgrounds, etc., and for their maintenance and operation. If the fees for admission to these recreational facilities were adequate to meet the expenses, there would be no need for a property tax levy.

We are satisfied that the parks department is not self-sustaining and that the small fees collected from those patronizing and enjoying the parks, playgrounds, etc., are not collected for the purpose of profit either direct or indirect but for upkeep and maintenance and, therefore, are not taxable.

The question as to whether the city is exercising a governmental or a proprietary function, in the establishment and operation of parks, playgrounds, etc., for the pleasure, recreation and health of its inhabitants, we do not find it necessary to determine at this time. The authorities are divided upon that point. There is one line of cases holding that the city is discharging a governmental function in providing parks, etc., and there is another holding it is acting in a proprietary capacity. All the cases that we have read, however, arose out of actions for tort.

The petitioner admits liability for its gross income from advertising and bus fares.

We conclude that, so far as the income from parking meters, swimming pools and the golf course is concerned, the tax commission is without jurisdiction to levy and collect a tax. As to the other items the tax was properly levied and may be collected.

The proceedings and action of the tax commission are modified to conform herewith.

LOCKWOOD, C. J., and McALISTER, J., concur.