(No. 6903. October 30, 1941)

FOSTER'S INC., a corporation; O. J. FOSTER and C. B. LITTLE, Appellants, v. BOISE CITY, a municipal corporation, WESTERMAN WHILLOCK, as Mayor, SAM S. GRIFFIN, A. A. WALKER, T. J. JONES, JR., and M. S. PARKER, as members of the Common Council, and GEORGE HASKIN, as Chief of Police, of Boise City, Respondents.

(118 Pac. (2d) 721)

Martin & Martin, for Appellants.

C. Stanley Skiles and Wm. H. Langroise, for Respondents.

AILSHIE, J.—February 15, 1940, Boise City entered into an agreement with the Dual Parking Meter Company, a corporation, providing for the installation of 577 penny-nickel automatic parking meters, Type D 2-S-PN. The agreement provided for a trial period beginning with the completion of installation and concluding May 1, 1940; that, during that time, the city should retain all receipts and moneys collected through operation of the meters. The company agreed to sell, if the city elected to buy, the equipment to the city for the sum of $61.00 per meter, which should include all charges and costs, together with the service of a trained maintenance expert for one year. Upon exercising its option, July 27, 1940, to pay for the equipment, the city agreed on a sum equal to 75% of the income thereafter received from the operation of the meters; title to the meters to remain in the company until payment in full.

March 11, 1940, the city council passed Ordinance No. 1780, providing regulations relative to the parking of vehicles on the public streets, for the installation, regulation, control and use of parking meters; for the establishment of parking meter zones on certain city streets in the business districts; prescribing the rights of owners or operators of vehicles within the zones; and for the enforcement, and penalties for violation, of the ordinance. Since March 25, 1940, the meters have been operating continuously under the terms of the ordinance.

May 6, 1940, the city council passed Ordinance No. 1793, amending sec. 5 of the former ordinance, allowing for the payment of $1.00 per year for issuance of "a permit and identification card for each delivery type

vehicle used exclusively in the delivery, drayage, and/or transportation of goods and merchandise";
entitling the operator of such vehicle to park within a metered space for a period not to exceed twenty minutes at any one time, and while actually engaged in loading or unloading merchandise, without deposit of coins, as otherwise provided in the ordinance.

This action was instituted by O. J. Foster, operating as Foster's Inc., "General furniture business, furniture dealers," lessee of the premises located at 816 and 818 Bannock Street, and C. B. Little, owner of the building, to perpetually enjoin defendants from in any manner enforcing the provisions of the parking meter ordinance, carrying out or exercising any of the provisions of the agreement, from purchasing, using, or operating parking meters upon the streets of defendant city, and especially in front of the premises of plaintiffs. The matter was tried to the court without a jury and judgment was entered dismissing the action, from which plaintiffs have appealed. In the meanwhile, Mr. Foster has deceased, and prosecution of this appeal is continued by his co-plaintiffs.

The following are appellants' contentions in this cause:

That Ordinance No. 1780 and the agreement between the meter company and respondents are illegal, void, and contrary to, and forbidden by, Art. 8, sec. 3, of the constitution, in that the same creates an indebtedness or liability against the city, "exceeding in that year, the income and revenue provided for it for such year, . . . . " and "neither before nor at the time of incurring this indebtedness has the City provided for the collection of an annual tax sufficient to pay such indebtedness as it falls due, nor to constitute a sinking fund for the payment of the principal thereof within twenty years of the date of contracting the same";

That the three parking meters installed in front of appellants' place of business now do and will continue to constitute obstructions and nuisances on the street and sidewalk;

That the ordinance is contrary to and forbidden by art. 12, sec. 2, of the constitution; that it is in conflict with

secs. 48-524 and 48-525, I. C. A.; and that the ordinance provides rules and regulations contrary to chap. 5, title 48 of the Code; that the ordinance is contrary to and forbidden by art. 1, secs. 13 and 14, of the constitution; that the ordinance is void, illegal and of no force or effect, for the reason that the establishing of parking meter zones in the city streets is an unauthorized abandonment of the terms of the patent from the United States to the mayor of Boise City and the filing of the plat thereof dedicating the streets and alleys to the use of the public. (See 1939 Sess. Laws, chap 215, amending charter of Boise City.)

The trial court found, inter alia, as follows:

"V.

"That pursuant to said ordinances, and after they were in force and effect, the defendants designated a number of the streets of Boise City, including Bannock street in front of the above described premises, as a parking meter zone, and within such zone caused to be installed parking meters of the type described in the ordinances. Each meter is 15 inches in height, $6\frac{1}{2}$ inches in width facing the street, and $4\frac{1}{2}$ inches in depth, and is set upon a metal post 2 inches in diameter and 36 inches in height, the total height of the meter and post being 51 inches. Each meter post is set in the sidewalk approximately 12 inches from the street edge. The meters are placed 20 feet apart, with a clear unobstructed space between them. The space along the street line in front of the premises above described is 50 feet, and three of said meters are placed in the sidewalk aforesaid within the said space. The sidewalk in front of the premises is 14 feet in width and there is approximately 13 feet of clear space between a meter and the inside edge of the sidewalk. Said meters bear a sign instructing the person intending to park opposite the same how to operate it and stating the limitation on the parking of vehicles as provided in said ordinances. The meter is designed to operate, and does operate, so that when the time limit expires a red signal is automatically displayed, so indicating to the operator of the vehicle and to the enforcing officers. The parking meter zone is in the more congested business section of the City,

and prior to the installation of said parking meters therein a serious problem to the City and the public in connection with moving traffic and the parking of cars along the outside border of the streets therein existed. The City had adopted regulations respecting traffic and parking, but devices and facilities for the enforcement thereof were entirely inadequate and unsatisfactory, and the City was not able practically and effectively to enforce the regulations or to prevent congestions of moving traffic and parking. There were numerous vehicular accidents in this area; that the operation and use of the parking meters has resulted in eliminating overcrowded parking conditions, and decreasing double parking, accidents, congested traffic conditions, and has facilitated the proper enforcement of traffic and parking regulation, and has provided more accommodations to the general public in the use of the streets .

"The meters installed on the sidewalks do not interfere with or obstruct pedestrian traffic, nor the entrance to or exit from the premises above described. Parking of vehicles and its regulation by the City has existed for a number of years. The premises above described, in addition to an exit on Bannock street, [in front of premises] has two exits on an alley at the rear and an exit on the west side, and all such exits are available for loading and unloading of merchandise to and from said premises.

### "XII.

"That the ordinances above mentioned and the installation and operation of said meters, and the regulations in and pursuant to said ordinances, were intended by the defendants as a means for regulation of traffic and parking, and are an effective means therefor, and were not designed and passed, installed or operated, for the purpose of raising revenue for the general fund and use of the City, and that the amounts collected through the operation of said meters are incident only to such regulation, and the fee imposed is not disproportionate to expense to the City in respect to traffic, parking, regulation thereof, and enforcement.

"That Bannock street hereinbefore mentioned, and the

property above described, are within the area described in the patent from the United States of America to Henry E. Prickett, Mayor of Boise City, and the official plat of said area."

Sec. 3 of Art. 8 of the Constitution, in so far as it is involved in this cause, reads as follows:

"No . . . . city . . . . shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year," . . . .

■ It is contended that the transaction here involved is violative of the foregoing provision of the constitution, in that it created a debt in excess of the income provided for the payment thereof for the year in which the debt was incurred. This contention is not supported by the circumstances of the case. The first contract entered into February 15, 1940, between the city and the company, was merely a contract granting a permit and license to the company to install its meters within and along certain streets specified and within the parking meter zone. It specifically provided that the city *should incur no liability whatever on account thereof,* either for installation, maintenance or otherwise. It provided, however, that, as consideration for the license and permit issued by the city, the company gave the city an option to purchase the meters and equipment some time prior to June 1, 1940, on specified terms and conditions. This limitation of time was later extended, by special agreement, to July 31, 1940.

No "debt or liability" was created by or on the part of the city prior to the making of the contract July 27th and which was embodied in plaintiff's exhibit "H" (Ordinance or Contract No. 1800). By the latter contract the city availed itself of the option to purchase the meters (577 in number) installed and fully equipped, for $61.00 per meter, making a total of $35,197. By this contract the city was given a further "trial period ending October 31, 1940," within which to use and operate the system and decide whether "to keep or to purchase said meters." It was further provided that payments should be made monthly of "a sum equal in the amount to seventy-five

(75%) per cent of the income, or receipts, received by the City from the operation of said meters." In the meanwhile, the city adopted a budget and passed an appropriation ordinance (No. 1800) for raising of revenue, within the fiscal year 1940-1941 (May 6, 1940, to May 4, 1941, inclusive) sufficient to provide for the purchase price of these meters.

It is quite clear that no *debt or liability* was created against the city by these transactions except such as provision was made for the payment or liquidation of during the fiscal year for which it was incurred; nor has it been made to appear that it is violative of any of the provisions of the Boise City Charter or the general statutes above cited. This transaction does not come within the prohibtions of the rule announced in *Feil v. City of Coeur d'Alene*, 23 Idaho 32, 129 Pac. 643, 43 L. R. A., N. S., 1095; *Miller v. City of Buhl*, 48 Idaho 668, 284 Pac. 843, 72 A. L. R. 682; *Williams v. City of Emmett*, 51 Idaho 500, 6 Pac. 2d 475; and *Straughan v. City of Coeur d'Alene*, 53 Idaho 494, 24 Pac. 2d 321, relied upon by appellants.

The contention, that the city ordinance (No. 1780) is in conflict with secs. 13 and 14, art. 1 of the constitution, for the reason that it deprives appellants of their property without due process of law, and takes their property without payment of "just compensation" for the property taken, is not well founded. We have held, and it is the accepted rule in this state, that, where property is once dedicated, taken or condemned for public use, it is competent and proper for the land owner to show the probable damage that he will or may "sustain by reason of the most numerous and injurious use" to which the condemnor may "lawfully put the property under its condemnation." (*Idaho-Western Ry. Co. v. Columbia Conference, etc.*, 20 Idaho 568, 119 Pac. 60, 38 L. R. A., N. S., 497; *Crane v. City of Harrison*, 40 Idaho 229, 232 Pac. 578, 38 A. L. R. 15; *Powell v. McKelvey*, 56 Idaho 291, 53 Pac. 2d 626.)

When a street is acquired, either by dedication or condemnation, and opened for traffic, the municipality

has the power and authority to police the same and regulate the traffic thereon. (Sec. 49-1141, I. C. A.)

"It will be seen from the foregoing that the power of cities and villages in this state over the streets is exclusive and unlimited."

(*Carson v. City of Genesee*, 9 Idaho 244, 253, 74 Pac. 862), 108 Am. St. Rep. 127.

In *Packard v. O'Neil*, 45 Idaho 427, 438, 262 Pac. 881, 885, 56 A. L. R. 317, it was said:

"The right to use the public ways of the state, and the control of that use, being public in its nature, is a special subject for regulation under the police power of the state. This legislative control may be exercised by the enactment of statutes governing the liabilities of drivers of vehicles of all kinds, where the purpose to be subserved is the safety of travelers generally on the roads."

(3 McQuillin, Municipal Corp., sec. 981, pp. 194, 195; *Southern Fruit Co. v. Porter*, 188 S. C. 422, 199 S. E. 537, 540; *City of Shreveport v. Breazeale*, 191 La. 1088, 187 So. 33, 34; *Fisher v. Cedar Rapids & M. C. Ry. Co.*, 177 Iowa 406, 157 N. W. 860, 864; *City of Chicago v. Marriotto*, 332 Ill. 44, 163 N. E. 369, 60 A. L. R. 501, 503; 44 C. J., sec. 3872, p. 1029.)

The police power is a necessary concomitant to complete sovereignty and inheres primarily in the state. The exercise of that power, within the corporate limits of cities and villages, has been delegated to the respective municipalities. The full exercise of that power is one of the governmental duties of the respective municipalities as arms of the state, in preserving the health, safety and general welfare of the people. (*City of Albany v. Anthony*, 262 App. Div. 401, 28 N. Y. Supp. 2d 963, 966; *Taylor v. Roberts*, 84 Fla 654, 94 So. 874, 875; *Greene v. City of San Antonio*, (Texas) 178 S. W. 6, 7; *City of Tacoma v. Roe*, 190 Wash. 444, 68 Pac. 2d 1028, 1029; *Ex Parte Duncan*, 179 Okla. 355, 65 Pac. 2d 1015, 1017; *Strickfaden v. Greencreek Highway Dist.*, 42 Idaho 738, 750, 248 Pac. 456, 49 A. L. R. 1057; *Duval Lumber Co. v. Slade*, (Fla.) 2 So. 2d 371, 372.)

 A public street or highway is free to all persons who choose to travel over it, whether they be abutting property owners, residents of the municipality, the county, the state, or of a foreign state, with the exception only; that the abutting property owner has the additional right of ingress and egress. (*Village of Sandpoint v. Doyle*, 14 Idaho 749, 757, 95 Pac. 945, 17 L. R. A., N. S. 497; *Packard v. O'Neil*, 45 Idaho 427, 262 Pac. 881; 56 A. L. R. 317; *Powell v. McKelvey*, 56 Idaho 291, 305, 53 Pac. 2d 626; *Ex Parte Duncan*, 179 Okla. 355, 65 Pac. 2d 1015, 1017; *Owens v. Owens*, 193 S. C. 260, 8 S. E. 2d 339, 343; *Zimmerman v. Met. St. Ry. Co.*, 154 Mo. Ct. App. 296, 134 S. W. 40, 42; 4 McQuillin, Munic. Corp., sec. 1425, pp. 79-81.)

 The right of ingress and egress, however, is subject to regulation and police control. *Village of Sandpoint v. Doyle*, 14 Idaho 749, 95 Pac. 945; 17 L. R. A., N. S. 497; *County Court of Webster County v. Roman*, 121 W. Va. 381, 3 S. E. 2d 631, and other cases.

Appellants are afforded reasonable means of ingress and egress to and from their premises. The court found, and the evidence supports the finding, that

"The premises above described, in addition to an exit on Bannock street, [in front of the premises] has two exits on an alley at the rear and an exit on the west side, and all such exits are available for loading and unloading of merchandise to and from said premises."

No one would venture to question the general power of a municipality to regulate and police the traffic on the city streets. That has been done from time immemorial. The difficulty arises when we come to determine just the extent to which that power may be exercised and the limitations thereof. In the early days, after the passage of pack horse and donkey transportation, they used to maintain hitching racks and posts around the public square, in villages and cities, for parking carts and wagons, and hitching oxen, horses and teams. Later, when the motor vehicle came into use, the hitching posts and racks disappeared and other means of traffic regulation and policing had to be devised. The power of regu-

lation did not cease or vanish with the advance of invention but rather modulated its directory, mandatory, and punitive authority to meet the changing physical and ambulatory conditions confronting an active society of a progressive people.

Municipal authorities found it convenient, dependent on the width of the street and the nature of the business conducted on each side of the street, and the amount of traffic, to determine what kind of parking should be observed; whether diagonal, parallel or in the middle of the street. Howsoever accomplished, it was attended with more or less danger of collisions, personal injuries and congestion of traffic, and resulted in the demand for more policemen or traffic patrolmen.

In an endeavor to solve the problem, a variety of expedients have been resorted to, until finally some mechanical genius invented the traffic or parking meter and set it up as a substitute for a traffic cop. In many ways, it must be admitted this mechanical substitute is more accurate and cold-blooded than the average policeman and is certainly not amenable to personal persuasion or undue influence in marking the time and displaying the warning signal. As objections to this means of policing street traffic and regulating parking, two major objections are urged: First, that it amounts to taking the property of the abutting owner without due process of law; and second, that it is the imposition of a tax on the right to use the streets.

The first proposition is hereinbefore answered, to the effect that: Dedication or condemnation of a street contemplates the most onerous and injurious mode of use to which it can be lawfully devoted. (*Idaho-Western Ry. Co. v. Columbia Conference, etc., supra; Crane v. City of Harrison, supra; Powell v. McKelvey, supra.*) For illustration, we held in *Crane v. City of Harrison, supra,* that the lowering of a grade in front of Crane's residence, and thereby destroying his water and sewer pipes, was covered and contemplated by the original condemnation; and any resultant injuries were *damnum absque injuria.*

In *Powell v. McKelvey, supra,* we held that the con-

struction of an underpass below the street grade, in front of an abutting property owner, was covered by the original condemnation and not a cause of actionable damage to the abutting land owner. In the latter case Mr. Justice Givens reviewed the Doyle and Crane cases and many opinions from other courts holding to the same effect.

If it be urged that the construction and erection of parking meters along the street in front of abutting property could not be foreseen or contemplated when the streets were laid out, we answer that, while that may be true, there is as much reason for supposing they were contemplated as to suppose that traffic on the street would ever be conducted by motor cars; or that there would ever be occasion to park such mechanisms on the street. Such was always, however, within the range of possibility and, therefore, a possible use. It was said by Mr. Justice McReynolds, in *Frost and Frost Trucking Co. v. R. C. of California*, 271 U. S. 583, 46 S. Ct. 605, 610, 70 L. ed. 1101, 47 A. L. R. 457, as quoted in *Ex Parte Duncan*, 179 Okla. 355, 65 Pac. 2d 1015, 1018:

" 'The states are now struggling with new and enormously difficult problems incident to the growth of automotive traffic, and we should carefully refrain from interference unless and until there is some real, direct and material infraction of rights guaranteed by the federal Constitution.' "

The question we are now confronted with, concerning the installation and use of parking meters, has only come to the attention of the courts within the last few years; and there has been some divergence of judicial opinion on the subject. As late as February of this present year, in considering the question in the case of *Kimmell v. City of Spokane*, 7 Wash. 2d 372, 109 Pac. 2d 1069, 1079, Mr. Justice Blake, speaking for the supreme court of Washington, after review of many cases, said:

"Ordinances prescribing time limitations on parking have long been recognized as a proper exercise of the police power, both in the interest of the occupant of abutting property and of the traveling public. Such limitations, are designed to keep traffic moving, to minimize congestion, and, at the same time, to afford users

of the highways an opportunity to transact business with the occupants of abutting property. Time limitations upon parking have been necessitated by abuse of the privilege. It is obviously to the interest of the occupant of abutting property that such time limitations be strictly enforced, for the shorter the limitation and the more effectually it is enforced, the greater is his freedom of access to his premises.

"It strikes us that the parking meter is admirably designed to accomplish that result. We fail to see what difference it can make to either the traveler on the street or to the occupant of abutting property whether the time limitations be enforced by a policeman marking cars with a piece of chalk or by a mechanical device that registers 'Time's up' in a way that all may see. The object of both is to prevent overtime parking, and, of the two, it seems to us that the latter is more effective. With the latter, there are no minutes of grace as there are with the policeman while he is making his rounds 'marking' and 'checking up,' for the time begins to run when the car is parked, and ends when the meter registers 'Time's up.' That parking meters will diminish the vice of overtime parking and, consequently, speed up traffic, seems a certainty, for the car must be moved at the expiration of the time limited."

Parking meter ordinances, similar to the one here under consideration, have been upheld in the following cases:

In *State ex rel Harkow v. McCarthy*, 126 Fla. 433, 171 So. 314, 316, the court said:

"... the city elected to employ mechanical policemen to aid in large part the accomplishment of that purpose, [safeguard restrictive parking privileges and enforce ordinance] because they are efficient and economical and enable the authorities to pass the cost of providing parking privileges onto those who enjoy those privileges. That the ordinance, as indicated indeed by its provisions, was adopted in the bona fide exercise of the police power, and not primarily for the raising of revenue. ... "

And, again in *City of Phoenix v. Moore*, 113 Pac. 2d 935, 937, the Arizona court held:

"Parking meters, .... have been installed .... for the

purpose of policing and regulating such traffic during the busiest parts of the day . . . . this automatic device does the work that was formerly done by police officers under city ordinances . . . . the meters are mechanical policemen. . . . Clearly, the ordinance has for its purpose the regulation of a perplexing problem to cities and towns, created largely by the advent of motor vehicles.

In *City of Columbus v. Ward,* 65 Ohio Ct. App. 522, 31 N. E. 2d 142, 144, the court sustained a parking meter ordinance. The Minnesota supreme court, in the case of *Hendricks v. City of Minneapolis,* 207 Minn. 151, 290 N. W. 428, 430, in speaking of the purchase of parking meters for the city, held, "Municipalities have the power to purchase equipment and finance it by the revenue derived from its use."

The state of Oklahoma in the case of *Ex Parte Duncan,* 179 Okl. 355, 65 Pac. 2d 1015, 1017, upheld the use of parking meters, saying:

"Without the right to prohibit or regulate parking no orderly passage of vehicles could be accomplished. Therefore, we conclude that the parking meter ordinances do not violate the statute above quoted, inasmuch as they do not affect a right which can be called a free use of the highways. Moreover, the statute contemplates such regulations to be included in the exceptions therein expressed."

Courts in other parts of the country have also held parking meter ordinances valid: Massachusetts, in the case of *In re Opinion of Justices,* 297 Mass. 559, 8 N. E. 2d 179; New York, in *Gilsey Buildings, Inc., v. Incorporated Village of Great Neck Plaza,* 170 Misc. 945, 11 N. Y. Supp. 2d 694, 699, the court saying:

"The ordinance was adopted 'because of traffic conditions resulting from the parking of motor vehicles upon some of the highways in the business district of the village'; and its primary purpose is said to be to aid the public authorities, without costly expense entailed in the employment of additional policemen, to time the public in its parking; in short, to prevent overtime parking, and thus create a greater movement of traffic."

*Texas, Ex Parte Harrison,* 135 Tex. Cr. Rep. 611, 122 S. W. 2d 314; *Harper v. City of Wichita Falls,* Tex. Civ.

App., 105 S. W. 2d 743; *West Virginia, In County Court of Webster County v. Roman,* 121 W. Va. 381, 3 S. E. 2d 631; South Carolina, in *Owens v. Owens,* 193 S. C. 260, 8 S. E. 2d 339.

Parking meter ordinances have been held invalid in Alabama—*Birmingham v. Hood-McPherson Realty Co.,* 233 Ala. 352, 172 So. 114; 108 A. L. R. 1140; Rhode Island, In re Opinion to the House of Representatives, 62 R. I. 347, 5 Atl. 2d 455, 457, North Carolina, *Rhodes, Inc., v. Vehicular Parking, Ltd., v. City of Raleigh,* 217 N. C. 627, 9 S. E. 2d 389; 130 A. L. R. 311; Louisiana, *City of Shreveport v. Brister,* 194 La. 615, 194 So. 566; Iowa, *Brodkey v. Sioux City,* 229 Iowa 1291, 291 N. W. 171, 296 N. W. 352.

It is further argued by appellant, that the parking fee required to be deposited in these meters is in fact a tax imposed for the use of the street and is intended as a revenue measure. It must be conceded that, if this is in fact a revenue measure, it is invalid. In *State v. Nelson,* 36 Idaho 713, 722, 213 Pac. 358, 361, we held:

"A license that is imposed for revenue is not a police regulation, but a tax, and can only be upheld under the power of taxation. . . . A city or village cannot, in the exercise of its police power, levy taxes. . . .

"One of the distinctions between a lawful tax for regulatory purposes and one solely for revenue is: If it be imposed for regulation, under the authority of sec. 2, art. 12, of the constitution, the license fee demanded must bear some reasonable relation to the cost of such regulation."

The right to travel over a street or highway is a primary absolute right of everyone, but while it is such, the exercise of that right may be *regulated* in almost every respect. For instance; it is proper to prescribe what kind, size or weight of vehicle or means of transportation one may not use in traveling over a street; the speed may be regulated; stops may be required at given places; signals may be required; right of way of one driver over another may be specified; right of way to be forfeited under certain conditions; right of way of

pedestrians over vehicle at certain crossings; yielding of right of way, to all vehicles approaching, by a driver entering a trunk highway from another highway; requirements may be made as to headlights, rear lights, reflectors, clearance lamps and rear vision mirrors; also the use of flares for all motor trucks operating outside the business or residential districts for a definite time after sunset and before sunrise; requirements are also given for the equipping of bicycles; special directions are given in case of accident, and also pedestrian movements. (1939 Sess. Laws, chap. 107, p. 176; chap. 250, p. 615; chap. 103, p. 171; chap. 108, p. 180; Title 48, I. C. A.)

This principle was anticipated and recognized in *Village of Sandpoint v. Doyle,* 14 Idaho 749, at 759, 95 Pac. 945, 948, 22 A. L. R., note, pp. 942, 943, wherein we considered the right of a municipality to prohibit an abutting property owner access to a bridge built in front of his property. After holding that the right to ingress and egress was absolute in an abutting property owner, the court, among other things, said:

"In such case, while the municipality may adopt reasonable rules and regulations with reference to the erection and maintenance of buildings and all approaches to the same, and *entrance to and over the street,* it cannot absolutely prohibit the property owner from using the street and enjoying his right of going and coming to and from his property through and over such street." (Italics supplied.)

*Continental Oil Co. v. City of Twin Falls,* 49 Idaho 89, 107, 286 Pac. 353; 19 R. C. L., sec. 113, p. 807.

Effective exercise of the police power necessarily involves expenditures in many ways. The means and instrumentalities, by and through which the supervising powers of the policing authority are brought to bear on the subject to be regulated, involve costs and expenses. It is only reasonable and fair to require the business, traffic, act, or thing that necessitates policing, to pay this expense. To do so has uniformly been upheld by the courts. On the other hand, this power may not be resorted to as a shield or subterfuge, under which to enact

and enforce a revenue-raising ordinance or statute. (Cooley on Taxation, (4th ed.) sec. 1680; 3 McQuillin, on Munic. Corp., sec. 987.)

The fact, that the fees charged produce more than the actual cost and expense of the enforcement and supervision, is not an adequate objection to the exaction of the fees. The charge made, however, must bear a reasonable relation to the thing to be accomplished. (*State v. Nelson,* 36 Idaho 713, 213 Pac. 358; *Best Foods v. Welch,* D. C. 34 Fed. 2d 683, 687; *Standard Oil Co. v. Graves,* 249 U. S. 389, 39 S. Ct. 320, 63 L. ed. 662; *Pugh v. City of Des Moines,* 176 Iowa 593, 156 N. W. 892, 895; L. R. A. 1917F 345; *City of Buffalo v. Stevenson,* 207 N. Y. 258, 100 N. E. 798, 800; *Packard v. Banton,* 264 U. S. 140, 44 S. Ct. 257, 68 L. ed. 596, 601; McQuillin on Munic. Ordinances, sec. 458.)

The spread between actual cost of administration and the amount of fees collected must not be so great as to evidence on its face a revenue measure rather than a license tax measure. *Standard Oil Co. v. Graves,* 249 U. S. 389, 39 S. Ct. 320, 63 L. ed. (U. S.) 662, 666.

The trial judge found that the ordinances "were intended by the defendants as a means for regulation of traffic and parking, and are an effective means therefor, and were not designed and passed, installed or operated, for the purpose of raising revenue for the general fund and use of the City, and that the amounts collected through the operation of said meters are incident only to such regulation, and the fee imposed is not disproportionate to expense," etc.

The evidences and admissions contained in the record fully justify the finding of the court in this respect.

We conclude that the ordinances and contract involved are valid and that the judgment should be affirmed. Affirmed with costs to respondents.

Budge, C.J., and Givens, J., concur.

MORGAN AND HOLDEN, JJ., concurring—We concur in the affirmance of the judgment appealed from, but desire that it be understood we are not in accord with the rule referred to in the opinion announced in *Feil v. City of Coeur d'Alene,* 23 Ida. 32, 129 Pac. 643, 43 L. R. A.,

N. S., 1095; *Miller v. City of Buhl,* 48 Ida. 668, 284 Pac. 843, 72 A. L. R. 682; *Williams v. City of Emmett,* 51 Ida. 500, 6 Pac. 2d 475 and *Straughan v. City of Coeur d' Alene,* 53 Ida. 494, 24 Pac. 2d 321. We dissented from the decision of *Straughan v. City of Coeur d'Alene,* on rehearing, 53 Ida. 503, 24 Pac. 2d 324, and our views with respect to these cases have undergone no change.