Argued September 6; affirmed October 9, 1945

# HICKEY *v.* RILEY ET AL.

(162 P. (2d) 371)

*Arthur E. Prag,* of Portland (Hoy & Prag and Andrew Hansen, all of Portland, on the brief), for appellant.

*L. E. Latourette,* City Attorney, and *James West,* Deputy City Attorney, both of Portland, for respondents.

HAY, J.

In this action the plaintiff and appellant, James Hickey, sought, inter alia, a judicial declaration of the unconstitutionality of certain ordinances of the City of Portland, under which the city has caused meters to be installed for the regulation of the parking of automobiles. Plaintiff is the lessee of certain premises within the parking-meter area, wherein, for thirty years last past, he has done business as a dealer in sewing machines and other merchandise. Parking meters have been installed upon the street curb in front of his place of business, and others upon the curbs for more than a city block "in every direction" therefrom.

Nine separate grounds upon which the ordinances are alleged to be unconstitutional or otherwise invalid are set forth in the complaint, but only three of them are argued upon this appeal. The remaining grounds are: (1) that the ordinances are class legislation, granting to one class of citizens privileges and immunities which are not granted equally to all citizens, in violation of Article I, section 20, Constitution of Oregon; (2) that the use of the public streets for parking purposes for the raising of revenue is an unauthorized abandonment of the purposes for which such streets were originally dedicated; and (3) that the ordinances are actually revenue measures and not regulatory ones, and that the city has no authority to impose a revenue tax upon motor vehicles.

■ The constitutional questions which have not been argued have nevertheless had our attention, but as to them the asserted unconstitutionality does not appear so clearly upon the face of the ordinances as to require a departure from the general rule that such questions

will be considered only when insisted upon and adequately argued.· 16 C. J. S., Constitutional Law, section 96.

The city, while admitting installation and maintenance of the meters, joined issue with the other material allegations of the complaint. The trial court, after a hearing, filed a memorandum opinion sustaining the constitutionality of the ordinances, made formal findings of the issues in favor of the city, and gave judgment and decree accordingly. Plaintiff appeals.

On November 19, 1936, the city council enacted Ordinance No. 68868, a general traffic code which, among other matters, imposed time-limitations upon parking in certain areas. All of the parking-meter ordinances which are involved in the present case were enacted as amendments to and as parts of such general traffic code. These amendments are:

Ordinance No. 70240, enacted November 18, 1937, which authorized the installation of traffic meters for an experimental period of 120 days.

Ordinances Nos. 70455 and 70456, enacted January 13, 1938, authorized the installation of parking meters, the cost thereof to be met by application thereto of one-half of the funds to be derived from the operation of the meters.

Ordinance No. 70554, enacted February 16, 1938, established a parking-meter fund, and required moneys derived through operation of the meters to be credited to such fund and applied against obligations incurred in the installation of the meters.

Ordinance No. 70842, enacted April 27, 1938, amended the last-mentioned ordinance by limiting expenditures from the parking-meter fund to the

"installation, operation and maintenance of said parking meters and the regulation, enforcement, control, engineering and construction in connection with vehicular and pedestrian traffic within the city".

Ordinance No. 71132, enacted July 7, 1938, authorized the continuance of the parking meters beyond the 120-day experimental period.

Ordinance No. 75574, enacted July 2, 1941, authorized purchase of additional meters and a loan of $15,470.00 from the general fund of the city to the parking-meter fund.

Ordinance No. 75607, enacted July 10, 1941. This ordinance comprised a recodification of the entire traffic code of the city, and was compiled under the supervision of the Bureau of Municipal Research and Service of the University of Oregon. It included provisions providing for and regulating the use of parking meters. This was the ordinance which was in force at the time of the institution of the case at bar. Its declared purpose was as follows:

"As a means of relieving motor vehicle traffic congestion within a certain business district of the city of Portland, caused by the double parking and overtime parking of motor vehicles and a general abuse of parking privileges, and to afford adequate control and regulation of traffic moving to and from the said congested district, and for the purpose of establishing an efficient system applicable for the enforcement of parking regulations, and to facilitate a greater freedom for the motor vehicle user in transacting business requiring a relatively short period of time within the district as hereinafter designated and as an exercise of the police power, the installation, use, and maintenance of parking meters in the city of Portland is hereby authorized."

■ The city suggests that plaintiff is without legal capacity to maintain the present suit, in that he neither alleged nor proved that the acts of the city of which he complains inflicted upon him any special injury different from injuries suffered by the public generally. No demurrer upon this ground was interposed in the lower court, and in any event we believe that the point is not well taken. The complaint alleges and the proof indicates that plaintiff is the lessee of property abutting upon a public street; that parking meters have been installed in front of and immediately adjacent to his leased premises; that the meters interfere to some extent with access to the premises by plaintiff and his customers; that plaintiff has heretofore been arrested and compelled to pay a fine for parking his automobile upon a metered location without paying the meter fee, and that the city threatens to continue to cause his arrest and prosecution if he persists in such conduct. These facts, in our· opinion, show a special injury to plaintiff and are sufficient to permit him to bring suit in his own name. *Friendly v. Olcott*, 61 Or. 580, 123 P. 53; *Winslow v. Fleischner*, 110 Or. 554, 223 P. 922.

Article I, section 20, Constitution of Oregon, provides in part as follows:

> "* * * No law shall be passed granting to any citizen or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

■ Appellant argues that the ordinances discriminate against motorists and in favor of operators of other classes of vehicles, such as those drawn by horses. This argument is unsound. The traffic upon the streets of a modern city, particularly in the business district, is

almost entirely motorized. The fact that an occasional horse-drawn vehicle may use the streets is immaterial. It is competent for the municipality to legislate in regulation of the preponderant cause of traffic congestion, and such legislation may not be attacked upon the ground that it does not include within its operation other forms of traffic which may occasionally be found upon the streets. 12 Am. Jur., Constitutional Law, section 484, and authorities cited under notes 6, 9, 10, 13, 16 and 19; *Spicer v. Benefit Ass'n,* (1933) 142 Or. 574, 588, 17 P. (2d) 1107, 21 P. (2d) 187, 90 A. L. R. 517. Such separate classification and regulation of automobiles is not class legislation in the sense prohibited by the constitution. 12 Am. Jur., Constitutional Law, section 516; 5 Am. Jur., Automobiles, section 23; Annotation, L. R. A. 1918D, 134; Annotation, 78 A. L. R., 815; *State v. Swagerty,* (1907) 203 Mo. 517, 102 S. W. 483, 10 L. R. A. (N. S.) 601, 120 Am. St. Rep. 671, 11 Ann. Cas. 725; *Louisville v. Louisville Automobile Club, Inc.,* (1942) 290 Ky. 241, 160 S. W. (2d) 663.

■ The meter devices installed by the city are set in operation by the insertion therein of a five-cent piece. A dial upon the meter indicates, when the coin is inserted, that the motorist is entitled to park his car for one hour at the street curb opposite the meter. Appellant insists that the exaction of a parking fee discriminates in favor of the rich and against the poor. The argument is without merit. The expense of operating a motor-car is so considerable, that it would seem improbable that any motorist exists upon whom the imposition of a five-cent fee for the privilege of parking his car in the business area of a city would be an unreasonable discrimination.

Appellant says that the city may not lawfully exact a charge for the privilege of parking upon the public streets. Apparently he believes that the relative smallness of the fee does not affect the principle for which he contends, as he urges that the effect of the exaction of any fee is that the city, unlawfully, becomes a lessor of the public streets. As authority for his position, he cites *Rex v. Cross*, (1812) 3 Camp. Rep. (Eng.) 224; *Pugh v. City of Des Moines*, (1916) 176 Iowa 593, 156 N. W. 892, L. R. A. 1917F, 345; and *Lowell v. Pendleton Auto Co.*, (1927) 123 Or. 383, 261 P. 415. The Cross case involved an indictment for maintaining a common nuisance against the proprietor of a stage-coach concern, who caused his coaches to stand for unreasonably long periods upon the public highway at Charing Cross, London. The evidence indicated that generally six or seven coaches stood in a row, close to the curb; that they were often ranked in two and sometimes in three tiers; and that the defendant employed a number of persons to range the immediate vicinity, soliciting passengers for the coaches. The conditions were such that public traffic upon the street was seriously obstructed. It was held that every unauthorized obstruction of the highway to the annoyance of the public is an indictable offense. The opinion states that a stage-coach must of necessity be permitted to set down or take up passengers in the street, and must be allowed reasonable time for such purpose, but that private premises should be procured for the coach to stop in during the interval between the end of one journey and the commencement of another. "The king's highway is not to be used as a stable-yard."

It is to be borne in mind that, in those days, highways, and even streets in metropolitan areas, were narrow, crooked and inconvenient. The parking of

stage-coaches for unreasonable periods, coupled with
the activities of the persons who verbally advertised
for passengers, undoubtedly interfered with the
traveling public in the exercise of its right to use the
street as a thoroughfare, and thus was a public nui-
sance. *Pugh v. City of Des Moines,* supra, paraphrases
the expression quoted above from the Cross case thus:
"No one can make a private garage of the public
street." *Lowell v. Pendleton Auto Co.,* supra, states
"the well-established principle of law that the streets
and the highways are for the purpose of travel, and one
cannot eke out the inconvenience of his own premises
by taking in the public highway."

In *Opinion of the Justices,* (1937) 297 Mass. 559,
8 N. E. (2d) 179, it is said:

> "* * * Abutting owners ordinarily hold the title
> to the fee to the center of the public way, subject
> only to the easement of travellers to pass and
> repass. This easement of travel has been inter-
> preted in a broad sense. It comprises the installa-
> tion of water and gas pipes, sewers, telephone, tele-
> graph, electric light and power poles, wires and
> conduits, fire alarm and police boxes, hitching posts,
> traffic lights, signs and similar devices, as well as
> the obvious methods of transportation and passage
> included in the general term. All these are per-
> mitted because they facilitate the use of public ways
> for purposes of transportation or passage and
> promote the safety or comfort of those who travel.
> Whatever is done within the limits of the highway
> by the public or by members of it not justifiable
> as incidental to travel is a violation of the rights of
> the abutting owner. Commonwealth v. Morrison,
> 197 Mass. 199. Moran v. Gallagher, 199 Mass. 486.
> Commonwealth v. Surridge, 265 Mass. 425."

Keeping pace with the development of modern
highways and of modern means of transportation, the

courts have enunciated a broadening and expanding conception of public rights incidental to highway travel. Thus, in *Canastota Knife Co. v. Newington Tramway Co.,* (1897) 69 Conn. 146, 36 A. 1107, the court held that the operation of horsedrawn railways upon public streets was sanctioned by long continued custom, which had shaped the common law of Connecticut, and that an electric railway was not an additional servitude.

In *Cater v. Northwestern Tel. Exch. Co.,* (1895) 60 Minn. 539, 63 N. W. 111, 112, 28 L. R. A. 310, 51 Am. St. Rep. 543, it was said:

"* * * The question, then, is, what is the nature and extent of the public easement in a highway? If there is any one fact established in the history of society and of the law itself, it is that the mode of exercising this easement is expansive, developing and growing as civilization advances. In the most primitive state of society the conception of a highway was merely a footpath; in a slightly more advanced state it included the idea of a way for pack animals; and, next, a way for vehicles drawn by animals,—constituting, respectively, the iter, the actus, and the via of the Romans. And thus the methods of using public highways expanded with the growth of civilization, until to-day our urban highways are devoted to a variety of uses not known in former times, and never dreamed of by the owners of the soil when the public easement was acquired. Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed. And it is not material that these new and improved methods of use were not contemplated by the owner of the land when the easement was acquired, and are more onerous to him than those then in use. * * *"

*Yale University v. New Haven,* (1926) 104 Conn. 610, 134 A. 268, 47 A. L. R. 667, also indicates the expansion of the judicial conception of the scope of the public easement. We quote:

> "The early common law conception of the extent of this public easement has grown with the public necessity to include, not only the surface and a depth sufficient to make and keep the surface in proper condition for travel, but so much of the highway beneath the surface as is required for public purposes, such as the laying of sewers, catch basins, drains, hydrants and pipes for conveying water, gas, electricity and telephone and telegraph wires. It also has come to include not alone the right of travel and transportation upon and over the highway but the right to erect poles thereon for public utilities and to string wires from pole to pole, together with the equipment upon the poles for carrying electric power, telephone and telegraphic wires. None of these uses of the surface above or beneath the highway add a new servitude to the highway, or interfere, practically, with the fee of the abutter in the highway."

The city of Portland is governed under the provisions of a charter passed by the legislative assembly in the year 1903, as amended by the legislative assembly in 1905 and by the legal voters of the municipality in 1913 and subsequent years. The exercise of the police power, the regulation and control of the use of the city streets and of traffic thereon, and the keeping and maintaining of the streets in an open and safe condition for public use, are specifically delegated to the city by Paragraphs 60, 61 and 63 of section 2-105, Article I, Chapter II of the charter. Parking, both of draft animals and of wheeled conveyances, has been permitted by cities and towns from the earliest times. Conveniently located hitching-posts, hitching-racks, horse-

blocks and watering-troughs were in common use even within the memory of persons still living. The use of these devices involved some obstruction to the owners of abutting property in the exercise of their rights of access. With the advent of motorized vehicles, the hitching-post and other highway obstructions of the "horse and buggy" age disappeared, but the parking of vehicles increased greatly. The regulation of parking became a public necessity. To that end, parking zones came to be established, and in congested districts parking-time limits were fixed in order to facilitate the movement of traffic. The fact that plaintiff's access to his abutting property is, to some extent, partially obstructed by parked cars is not, in our opinion, a justifiable ground for complaint. Such parking was permitted, and was even regulated as to time, prior to the passage of the parking-meter ordinances. Cf. *Harper v. City of Wichita Falls*, (1937—Tex. Civ. App.) 105 S. W. (2d) 743. The rights of abutting proprietors to access to their premises are subservient to the primary rights of the public to the free use of the streets for the purposes of travel and incidental purposes. Plaintiff cannot insist upon a free and unrestricted right to park his own vehicles or those of his customers in the street opposite his property. Parking is not a right, but a privilege, and, as such, is subject to reasonable regulation under the police power. *Gardner v. City of Brunswick*, (1943) 197 Ga. 167, 28 S. E. (2d) 135. Reasonable access to plaintiff's premises for vehicular traffic has been provided by the establishment of an eighty-foot loading zone convenient thereto.

The use of parking meters has been generally approved by the courts. *Foster's, Inc., v. Boise City*, (1941) 63 Idaho 201, 118 P. (2d) 721; *City of Bloom-*

*ington v. Wirrick,* (1942) 381 Ill. 347, 45 N. E. (2d) 852; *Laubach & Sons v. City of Easton,* (1943) 347 Pa. 542, 32 A. (2d) 881. The imposition of a parking fee for regulatory purposes has likewise been approved generally. Evidence was introduced by the city showing that the use of parking meters has become general throughout the United States, 449 cities, situated in forty-one states, having installed them. The legality of their use for the purpose of regulating parking has been upheld in by far the greater number of cases in which it has been called in question. Most of the cases are collated in annotations in 108 A. L. R. 1152 and 130 A. L. R. 316. The only cases in which the courts have held such ordinances invalid, so far as we are advised, are: *Shreveport v. Brister,* 194 La. 615, 194 So. 566; *Rhodes, Inc., v. Raleigh,* 217 N. C. 627, 9 S. E. (2d) 389, 130 A. L. R. 311; *Birmingham v. Hood-Mc-Pherson Realty Co.,* 233 Ala. 352, 172 So. 114, 108 A. L. R. 1140. See also *In re Opinion to House of Representatives,* 62 R. I. 347, 5 A. (2d) 455. In the Birmingham case, the instrument of dedication contained restrictions which, in the opinion of the court, prevented the city from exacting any charge or fee for parking privileges. The other authorities cited hold that the charter or statutory powers of the cities involved were insufficient to authorize them to impose a parking charge.

 Appellant characterizes the ordinances as ''a tremendous revenue-producing means''. The evidence indicates that, between March 3, 1938, and March 31, 1944, the gross income from the parking meters was $1,145,305.81, and the cost of the purchase, installation, maintenance and repair was $221,810.73. Appellant maintains that the balance of $923,495.08, resulting from the operation of the meters for a period of some

six years, was surplus revenue, which has been used unlawfully by the city for purposes other than the initial cost, maintenance and operation of the meters. It is well settled that the amount of the fee exacted is a proper matter to be considered in determining whether the ordinance is a proper exercise of the police power as a regulatory measure, or is an exercise of the taxing power. 4 Cooley on Taxation, 4 ed., sections 1786 and 1787. The city of Portland has no authority to impose a revenue tax upon motor vehicles, as the license tax imposed by the state thereon is expressly stated to be in lieu of all other taxes and licenses except municipal license fees under regulatory ordinances. Section 115-106, O. C. L. A.; 4 Cooley on Taxation, 4th ed., section 1680. Generally, a license fee imposed for regulatory purposes should not materially exceed the ''expense of issuing the license, inspecting and regulating the vehicles so as to require their compliance with the regulations imposed by the ordinance''. *In re Fine,* (1928) 124 Or. 175, 264 P. 347; *County Court of Webster County v. Roman,* (1939) 121 W. Va. 381, 3 S. E. (2d) 631; *Foster's, Inc., v. Boise City,* (1941) supra (63 Idaho 201, 118 P. (2d) 721); *Wilhoit v. City of Springfield,* (1943) 237 Mo. App. 775, 171 S. W. (2d) 95; *Opinion of the Justices,* (1937) supra (297 Mass. 559, 8 N. E. (2d) 179); *Rhodes, Inc. v. Raleigh,* (1940) supra (217 N. C. 627, 9 S. E. (2d) 389, 130 A. L. R. 311); *Hendricks v. Minneapolis,* (1940) 207 Minn. 151, 290 N. W. 428; *Clark v. City of New Castle,* (1938) 32 Pa. D. & C. 371; *Louisville v. Louisville Automobile Club, Inc.,* (1942) supra (290 Ky. 241, 160 S. W. (2d) 663).

In the beginning, as has been stated, the city caused a certain number of meters to be installed and operated on an experimental basis for a limited period. The

moneys derived from such operation were held in a special fund. The results of the experiment having been satisfactory to the city authorities, they determined to adopt the meter system upon a permanent basis, and subsequent ordinances provided that the revenue should continue to be held in a special fund, and should be used to meet the expenses of installation, operation and maintenance of the parking meters and of "the regulation, enforcement, control, engineering and construction in connection with vehicular and pedestrian traffic within the city". The ordinance which provided for the experimental installation of meters contained a declaration of purpose clause reading as follows:

"Purely as a means of relieving motor vehicular traffic congestion within a certain business district of the city caused by the double parking and over-parking of motor vehicles and a general abuse of parking privileges, and with the purpose of establishing an efficient system applicable to the enforcement of parking privileges, and to facilitate a greater freedom for the motor vehicle user in transacting business, requiring a relatively short period of time, and as an exercise of the police power, the council hereby authorizes the installation and use of parking meters for an experimental period of 120 days from the effective date of this ordinance."

This declaration was later amended by adding, as an additional purpose, adequate control and regulation of traffic moving to and from the congested district. This declaration of legislative purpose is, in itself, persuasive and must be considered as true in the absence of sufficient evidence tending to show that the declaration was sham. *Kimmel v. Spokane,* 7 Wash. (2d) 372, 109 P. (2d) 1069.

The parking-meter ordinances are a part of a general traffic ordinance which embraces all types of motor vehicle control. The city regards the problem of traffic control as having a threefold aspect: (1) control of traffic in the congested areas; (2) regulation of parking in congested areas during business hours, to insure that the greatest possible number of cars may have parking privileges for a reasonable period, so that motorists may have opportunity to transact their business; and (3) the control of traffic into and out of the congested areas. In our opinion, it is reasonable and proper for the city thus to consider and treat the problem of traffic regulation as a whole. The moneys derived from the operation of the meters have been expended for the purposes stated in the ordinances, as amended. Included in such purposes is the installation and maintenance of traffic controls throughout the city. Such traffic controls include traffic signals, safety islands, street marking to direct traffic, tunnels for pedestrian use under dangerous intersections, the salaries of police officers engaged in policing parking meters and investigating traffic accidents, purchase of automobiles and other necessary equipment for the use of such officers, and the expense of remodeling the police station to provide facilities for handling cases of violation of traffic regulations. The effect of these measures of control, according to the evidence, is to render traffic to and from the metered areas more convenient and safe, and the expenditure of the meter revenues for such purposes, as expressed in the ordinances, is reasonably within the general purpose of traffic control. The amount of the expenditures, as well as the detail thereof, was made available to the plaintiff by the city, and was introduced in evidence by him. It does not appear that any

of the revenue was expended for purposes foreign to those authorized by the ordinances.

■ We think that it is beyond question that the ordinances were enacted primarily for traffic regulation and not for revenue. The fact that, in the operation of the meters, a revenue has resulted, does not, in itself, classify the ordinances as revenue measures. *State v. McFall,* (1924) 112 Or. 183, 229 P. 79. The right to apply the revenue not only to the narrow and restricted purposes of the mere installation, operation and maintenance of the meters, but also to the broad purposes of general traffic control where authorized by the enabling ordinances, has been upheld in a number of well-reasoned decisions.

In *Harper v. City of Wichita Falls,* supra (105 S. W. (2d) 743) the ordinance provided that the funds derived from parking meters should be expended ''for traffic regulations and control and in promoting the safety and well-being of the public in the handling of traffic upon the streets * * *''. It was held that the five-cent parking-meter fee was a police regulation and inspection fee, and not a tax. We quote from the opinion:

> ''If in the operation of the meters more money is realized than necessary to pay expenses incident thereto, then, under the terms of the ordinance, the city had the right to apply the excess 'to cover the cost of inspecting and regulating traffic involved in the proper control of the traffic upon the streets of the City of Wichita Falls,' as well as the cost of 'inspection, installation, operation, control and use of the parking meters and parking spaces described herein and involved in the checking up and regulating of the handling of the traffic and the parking of vehicles in the parking meter zones hereby created.'

"The right to use such collections for the purposes first stated, as well as for the second, is within the powers of the general control of the public streets, authorized by the home-rule provisions of the Constitution, in connection with provisions of article 1175, Rev. Civ. St., and powers vested in the city by its charter. The parking fee charged is not a tax but is a license fee for a privilege not possessed by the citizens, and is properly chargeable for regulatory purposes under the police powers of the city. Berry on Automobiles, §§ 78 and 79; 1 Blashfield's Encyclopedia Automobile Law, § 5, p. 178; 44 C. J. par. 3841, p. 10; 39 Tex. Jur. pp. 63, 74, pars. 606-619; 43 C. J. par. 221."

In *Louisville v. Louisville Automobile Club, Inc.,* supra (290 Ky. 241, 160 S. W. (2d) 663), the court gave its approval to a similar procedure to that adopted under the present ordinances by the city of Portland, as is shown by the following quotation from the court's opinion:

"The fee charged for the privilege of parking is for the purpose of defraying the cost of acquiring, installing, maintaining and supervising the meters, is valid and a reasonable charge, and if these fees exceed the cost and incidental expenses, excess will be used and applied for valid purposes within the doctrine approved in the cases of Blue Coach Lines v. Lewis, 220 Ky. 116, 294 S. W. 1080; Smith v. Com., 175 Ky. 286, 194 S. W. 367; McGlone v. Womack, 129 Ky. 274, 111 S. W. 688, 17 L. R. A., N. S., 885; Kroger Grocery & Baking Co. v. City of Lancaster, 276 Ky. 585, 124 S. W. 2d 745.

"As we read the ordinance, it provides for application of the proceeds from fees to the purposes named above, and for no other purposes, save 'for the regulation and control of traffic and the streets of the city,' which may be construed to include pay of traffic officers, whose duties in regard to the supervision of the meters are defined in the ordinance."

In *City of Phoenix v. Moore,* (1941) 57 Ariz. 350, 113 P. (2d) 935, it was said:

"* * * The revenues derived are designated as a special fund to be used in installing the parking system, its maintenance after installation and to enforce traffic regulations, and in furtherance of the program of the city for the safe use of its streets by automobiles, motor vehicles and pedestrians. Clearly, the ordinance has for its purpose the regulation of a perplexing problem to cities and towns, created largely by the advent of motor vehicles."

In *Wilhoit v. City of Springfield,* supra (237 Mo. App. 775, 171 S. W. (2d) 95), the ordinance under consideration was attacked as being primarily a revenue measure. Evidence was offered tending to show that, in adopting the ordinance, the purpose of the city was to collect a sufficient amount of revenue from the parking meters to enable it to repeal a certain gasoline tax. The court remarked that, if that had been the purpose, the enactment of the ordinance would have constituted legal fraud, which would have rendered it invalid. However, the court construed the ordinance to be a regulatory measure "relating to traffic regulations and offenses against public safety and regulating the use of public streets and highways of the City of Springfield * * *", and, in relation to the effect of the evidence showing a different purpose, took "the more charitable view that the primary purpose was to solve the enormously difficult and perplexing problems incident to growing traffic."

In *Bowers v. City of Muskegon,* (1943) 305 Mich. 676, 9 N. W. (2d) 889, the ordinance included a section reading, in part, as follows:

"The five-cent and one-cent coins required to be deposited in parking meters as provided herein are

hereby levied and assessed as fees to provide for the proper regulation and control of all parking and traffic upon the public streets, and alleys, also the cost of supervision and regulating the parking of vehicles in the parking meter zones created hereby, and to cover the cost of the purchasing, leasing, acquiring, installation, operation, maintenance, supervision, regulation, of the parking meters described herein and other traffic control devices and regulations. * * *''

Holding the ordinance to be a valid exercise of the police power and not a revenue measure, the court said:

''* * * Nor can it be said that receiving revenue for 'other traffic control devices and regulations,' as provided in section 17 of the ordinance, is so remote from the parking problem that to contemplate proceeds for such purposes from the parking meters is to create an intent as a matter of law to raise 'revenue under the guise of a police regulation.' ''

It is to be observed that the parking fee exacted under the Portland ordinances is modest and reasonable in amount. No doubt the mere fact that a fee is charged tends, in itself, to increase the effectiveness of the parking restriction. Cf. *Clark v. City of New Castle,* supra (32 Pa. D. & C. 371). Appellant contends that the evidence indicates that, in operation, the ordinances have not in fact regulated parking. On the contrary, it appears that since the installation of parking meters the ''turn-over'' of automobiles in the metered areas has increased by about fifty per cent, while the number of parked automobiles has increased from ten to fifteen per cent. These figures were developed as the result of a careful and systematic check made by the city. Incidentally, traffic accidents in the metered area have been reduced sixteen per cent.

■ The ordinances limit the time of parking to one hour. Appellant asserts, and offered evidence to prove, that not infrequently motorists unlawfully park for more than one hour, simply depositing additional coins in the meter from time to time. The detection of such violations, however, is an administrative matter, with which this court has no concern. *City of Portland v. Traynor,* 94 Or. 418, 183 P. 933, 186 P. 54, 6 A. L. R. 1410.

"* * * With the wisdom or expediency of such legislation, the Court is not concerned. And, of course, the Court must assume that the ordinance will be enforced reasonably; that parking will be limited to one hour, as the ordinance provides; * * *".

*Gilsey Buildings, Inc. v. Great Neck Plaza,* (1939) 170 Misc. 945, 11 N. Y. S. (2d) 694.

We are satisfied that the primary purpose of the ordinances was regulatory. Obviously, the imposition of even a small fee for the privilege of parking in the congested areas of a busy metropolitan city such as Portland, will result, over a six-year period, in the collection of a very large sum of money, but the mere largeness of the amount collected is irrelevant under the circumstances of this case. We know judicially that the regulation of the vehicular traffic in the downtown areas of modern cities has confronted the authorities with almost insuperable problems. The parking-meter device appears to have been at least a partial solution. We are of the opinion that, as against the plaintiff's contentions, the ordinances under consideration are to be construed as valid.

The decree of the lower court is affirmed. No costs will be allowed to any party.